TASTEE FREEZ DE PUERTO RICO, INC., peticionario, *v.* NEGOCIADO DE SEGURIDAD DE EMPLEO y HON. SECRETARIO DEL TRABAJO DE PUERTO RICO, recurridos.

*Número:* O-78-205       *Resuelto:* 28 de febrero de 1979

496

*Benjamín Rodríguez Ramón, Teodoro Peña García* y *José Raúl Cancio Bigas,* abogados de la peticionaria; *Jorge Soto Marrero, Miguel Rodríguez Villanueva* y *Lydia Lizarríbar Buxó,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Tastee Freez de Puerto Rico, Inc., opera un negocio de venta de helados, hamburgesas, pastelillos, refrescos y otros comestibles ligeros. Esos productos los vende a través de 18 establecimientos de su propiedad ubicados en Puerto Rico, los cuales bajo la razón social de Tastee Freez o Carroll's son administrados por arrendatarios de dichos negocios. Los arrendatarios contratan sus propios empleados, pagan los gastos de operación y a fin de cuentas obtienen ganancias o pérdidas.

El Departamento del Trabajo determinó que efectivo el 1ro. de enero de 1974 los arrendatarios y sus empleados se considerarían empleados de Tastee Freez, tanto bajo la Ley de Seguridad de Empleo de Puerto Rico, Ley Núm. 74 de 21 de junio de 1956, 29 L.P.R.A. sec. 701 y ss., como bajo la Ley de Beneficios por Incapacidad, Ley Núm. 139 de 26 de junio

de 1968, 11 L.P.R.A. sec. 201 y ss. Esta última ley cubre beneficios por incapacidad que no esté relacionada con el empleo. Al ser confirmada esa determinación administrativa por el Tribunal Superior, Tastee Freez recurre ante nos tachándola de errónea. Tastee Freez no acepta la determinación del tribunal de instancia en el sentido de que tanto los empleados de los arrendatarios y los arrendatarios mismos sean empleados de Tastee Freez. Decidimos revisar y expedimos el auto de *certiorari.*

La determinación de status de empleados hecha por el Departamento del Trabajo se fundó en la letra de dos disposiciones idénticas contenidas en las antes citadas dos leyes, 29 L.P.R.A. sec. 702 (k) (5) (pág. 64 *in fine* del Tomo 6A de L.P.R.A.), y 11 L.P.R.A. sec. 202 (j) (5) (pág. 101 del Suplemento Acumulativo de 1977 al Título 11 de L.P.R.A.), las cuales disponen textualmente lo siguiente:

"El servicio prestado por una persona será considerado como empleo bajo este Capítulo independientemente de si existe o no una relación obrero-patronal, a menos y hasta que se demuestre a satisfacción del Secretario que:

(A) En relación con la prestación de su servicio, tal persona ha estado y continuará actuando sin sujeción a mando o supervisión, tanto como cuestión de hecho como bajo su contrato de servicios; y

(B) Tal servicio es prestado bien fuera del curso usual del negocio para el cual se trabaja o fuera de todos los sitios de negocio de la empresa para la cual se trabaja; y

(C) Dicha persona está usualmente ocupada en algún trabajo, profesión o negocio independientemente establecido de la misma naturaleza de aquel comprendido en el servicio prestado."

En *Avon Products, Inc.* v. *Srio. del Trabajo,* 105 D.P.R. 803 (1977), se interpretó la disposición citada en relación con vendedoras a comisión de productos Avon. Se sostuvo que eran empleadas porque Avon no demostró los requisitos expresados en los incisos (B) y (C) antes citados.

Se sostuvo que Avon demostró el criterio expresado en el inciso (A)—ausencia de "control"—porque las vendedoras son amas de casa que en su tiempo libre se dedican a vender productos Avon sin horario fijo y sin límite de ruta.

Se sostuvo que Avon no demostró el criterio (B) porque el curso usual de sus negocios es la venta mediante vendedoras ambulantes; que ese servicio es parte integrante de la empresa y cada casa constituye el sitio de negocios de Avon.

Se sostuvo que Avon no demostró el criterio (C) porque la prueba fue insuficiente para establecer (1) que las vendedoras se dedicaban habitualmente a un negocio propio independiente, ya que no tenían inversión de clase alguna, no corrían riesgo de pérdida y no se beneficiaban de la plusvalía de la empresa o (2) que estuvieran en disposición de rendir el servicio a otras personas.

Se expresó que las frases "usualmente ocupada" e "independientemente establecido" presumen la existencia de una empresa separada, permanente y estable a la cual se dedique habitualmente la persona. Abundando sobre este extremo, en *Avon* se citan autores, al efecto de que esas frases distinguen entre personas que tienen negocio propio y personas que dependen de la continuidad de su relación con el principal para su sustento económico; que las palabras "usualmente ocupado" requieren que la persona habitualmente se mantenga en disposición de rendir servicios en el curso de su trabajo a otras personas; y que no se satisface ese criterio cuando el trabajo existe en relación con un principal, cuyo trabajo dejaría de existir cuando esa relación termine.

Se explica en *Avon* que en el Derecho Común Anglosajón la responsabilidad del principal por los actos de sus empleados se fundaba en el control que aquél ejercía o podía ejercer sobre los actos de éstos para aminorar el riesgo de daño. El propósito era imponer responsabilidad ya que se pensaba que teniendo facultad el principal de controlar los actos de sus empleados bien podía tomar medidas adecuadas para evitarlo.

*Avon*, supra, a la pág. 806. Claro, en nuestros días, debido a la generalización de las leyes de compensación por accidentes del trabajo y del estado contemporáneo de la responsabilidad civil en general no es necesario descansar en esa antigua premisa del citado Derecho Común.

■ A tenor con las disposiciones en ley citadas, se puede afirmar que todo servicio se considera empleo, a menos que el patrono demuestre la existencia de las siguientes condiciones: (1) que el patrono no ejerce, ni puede ejercer mando o supervisión sobre la persona; (2) que la persona presta el servicio fuera del curso normal o de los sitios de negocio del patrono; y (3) que la persona presta ese servicio como parte de la actividad normal de su trabajo, negocio o profesión, cuyo servicio está disponible a otras personas y no cesa al terminar su relación contractual con el patrono.

Tastee Freez comenzó operaciones en Puerto Rico estableciendo una oficina central que dirigía y suplía una cadena de establecimientos propios administrados por empleados suyos. Esos empleados administradores estaban a sueldo y no se preocupaban por el progreso de la empresa. Probablemente veían su ingreso fijo seguro. Tastee Freez estuvo al borde de la quiebra y se sometió a una reorganización bajo el Capítulo XI de la Ley federal de Quiebras. A principios de la década del 1960, Tastee Freez varió su sistema de operaciones. Eliminó a sus empleados administradores y comenzó a operar sus establecimientos mediante Contratos de Arrendamiento de Negocio en Marcha. Los arrendatarios fueron solicitados mediante anuncios en los periódicos, que ofrecían oportunidades a los interesados en hacerse de sus negocios propios. Los interesados escogidos recibieron entrenamiento en la administración de esa clase de negocios.

■ Un examen de los contratos de arrendamiento demuestra que además de contener los elementos típicos de esa clase de contratos, también contienen elementos propios de

contratos de franquicia. Los contratos de franquicia se caracterizan por la concesión a empresarios independientes del privilegio de distribuir productos de determinadas marcas o de prestar servicios bajo determinados nombres. Nada hay en nuestras leyes que prohíba esta clase de contratos. Esto es, contratos que a la vez de ser de arrendamiento contengan el elemento de contratos de franquicia para la venta o distribución de determinados productos. Si los contratos no contravienen la ley o la moral, son permisibles. "Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público." Código Civil, Art. 1207; 31 L.P.R.A. sec. 3372. *Castell Enterprises* v. *Registrador de la Propiedad*, 87 D.P.R. 775, 781 (1963); Guaroa Velázquez, *Las Obligaciones Según el Derecho Puertorriqueño*, pág. 12 (1964).

Para una mejor inteligencia del problema bajo estudio es conveniente ver de cerca los contratos en cuestión. Estos están sujetos a 25 cláusulas. La cláusula Núm. 1 dispone sobre la explotación del negocio por el arrendatario. La Núm. 2 provee para el término del contrato, que generalmente es de un año, con derecho a renovación por acuerdo mutuo. La Núm. 3 fija el canon de arrendamiento a base de cierto por ciento de las ventas. La Núm. 4 exige autorización de la arrendadora para hacer alteraciones en las propiedades. La Núm. 5 dispone que el arrendatario pagará la contribución mueble, patentes, licencias, agua, luz y teléfono y que si no lo hace, la arrendadora podrá pagarlos y rescindir el contrato. La Núm. 6 dispone que se arrienda un negocio en marcha para que el arrendatario lo explote como comerciante independiente en la operación de un negocio Tastee Freez o Carroll's. La Núm. 7 obliga al arrendatario a cumplir con las leyes aplicables, a no ceder el contrato y a mantener en operación constante 3 congeladores para suplir 3 variedades de helado.

La cláusula Núm. 8 dispone para el caso de que ocurran pérdidas por fuego, etc. La Núm. 9 provee para seguros y responsabilidad por daños a terceros. La Núm. 10 provee para la toma de posesión del negocio a la extinción del contrato o al violarse el mismo. La Núm. 11 provee para la extinción del contrato por falta del pago del canon. La Núm. 12 provee que el arrendatario debe mantener el equipo en buen estado y pagar por sus reparaciones. La Núm. 13 impone conservar los nombres Tastee Freez o Carroll's y a usar sólo productos autorizados por escrito por la arrendadora. La Núm. 14 provee cierto por ciento de las ventas que el arrendatario pagará para cubrir gastos de la arrendadora relacionados con administración, supervisión, contabilidad, almacenaje, acarreo, propaganda, laboratorio, fumigación, licencias, patentes y contribuciones. La Núm. 15 provee para el pago del inventario inicial de productos. La Núm. 16 provee para el pago de agua, luz y teléfono por el arrendatario desde que él toma posesión. La Núm. 17 provee que el arrendatario depositará diariamente cierto por ciento de sus ventas en una cuenta bancaria de la arrendadora para garantizar el pago de la mercancía, cánones y servicios y su obligación de pagar esos gastos si los depósitos no alcanzan. La Núm. 18 impone al arrendatario mantener la alta calidad de los productos, teniendo la arrendadora derecho a enviar un supervisor para asegurarse de ello y pedir que las fallas se corrijan. La Núm. 19 provee que el supervisor podrá verificar que las mezclas de helado no se diluyan o alteren, verificar la calidad de los productos y exigir que el arrendatario pinte el edificio.

La Núm. 20 provee para que el arrendatario emplee suficientes empleados para dar buen servicio al público. La Núm. 21 establece que los empleados que contrate el arrendatario son sus empleados y no de la arrendadora y que el primero es responsable de todas las obligaciones patronales relacionadas con dichos empleados. La Núm. 22 se relaciona con pólizas y primas de seguros. La Núm. 23 se relaciona con acciones judi-

ciales relacionadas con el contrato. La Núm. 24 provee las condiciones para la cancelación unilateral del contrato por cualquiera de las partes. La Núm. 25 provee para notificación por el arrendatario si tiene que ausentarse del negocio para que la arrendadora haga los arreglos pertinentes.

En ninguna de esas 25 cláusulas, surge relación alguna de mando o supervisión entre la arrendadora y *los servicios* que prestan el arrendatario y sus empleados. El citado inciso (A) no pretende abarcar todo mando o supervisión que se ejerza, sino sólo aquel mando y aquella supervisión que se ejerza sobre la persona "en relación con la prestación de su servicio".

Tanto el Secretario del Trabajo como el tribunal de instancia creyeron ver en los contratos que Tastee Freez, aunque no ejercía mando o supervisión sobre los arrendatarios o sus empleados, podía en cualquier momento ejercerlo. Pero no hay cláusula alguna que provea para esa facultad de parte de Tastee Freez de mando en relación con los servicios que prestan los arrendatarios o sus empleados. Hay cláusulas de supervisión, pero no se relacionan con esos servicios. Ninguna de esas cláusulas tiene que ver con la forma en que los arrendatarios o sus empleados realizan sus labores o disponen de su tiempo laborable. Recuérdese que en *Avon* la ausencia de control se basó en que las vendedoras no tenían horario fijo o rutas limitadas.

La supervisión contractual del presente caso se relaciona solamente con las normas que deben mantener los arrendatarios, como por ejemplo, la calidad y variedad de los productos disponibles para la venta, el equipo adecuado para la operación del negocio, y el número adecuado de empleados para servir al público, lo que nada tiene que ver con la labor que realizan los arrendatarios y sus empleados. La finalidad del contrato es, en parte, la de mantener unas normas uniformes en la operación de los establecimientos que llevan el nombre de Tastee Freez, para asegurar que el público obtiene

la misma calidad de productos y servicios en todos los establecimientos de dicha firma. Dichas normas de calidad y servicio están directamente vinculadas con el prestigio de la firma, lo cual es precisamente un elemento indispensable para mantener el valor de las franquicias.

La supervisión sobre la calidad de los productos es para determinar que los productos comprados a Tastee Freez no han sido adulterados o que los productos comprados a otras empresas tienen la calidad exigida por Tastee Freez. La supervisión sobre el número de empleados se limita a determinar si el público tiene que hacer largas filas como consecuencia de no haber suficientes empleados. Estas son preocupaciones legítimas de un empresario responsable y, después de todo, redundan en beneficio del público consumidor.

▪ Aparentemente tanto el Departamento del Trabajo como el tribunal de instancia encontraron chocantes esas cláusulas de supervisión. Pero si bien son atípicas en contratos de arrendamiento, son normales en contratos de franquicia. El otorgante de una franquicia tiene interés legítimo en velar porque el concesionario no perjudique el prestigio de su producto o de su nombre mercantil vendiendo productos inferiores o dando un servicio pobre al público. La preocupación del concedente de una franquicia no lo convierte en patrono del concesionario o de sus empleados.

El inciso (B) requiere demostrar que la persona presta los servicios fuera del curso usual del negocio o de los sitios de negocio del presunto patrono.

El curso usual de negocios de Tastee Freez es la distribución y venta de sus productos a sus arrendatarios. Prima facie, los arrendatarios y sus empleados parecen realizar sus labores en el curso usual y sitios de negocio de Tastee Freez. Pero hay diferencias significativas entre el caso *Avon* y el presente.

Las vendedoras de Avon no le compraban mercancía a dicha firma ni a otros suplidores. Gestionaban ventas para

Avon y recibían comisión. Aquí los arrendatarios compran mercancía a Tastee Freez y a otros suplidores.

■ De otro lado, los "sitios de negocio" de Tastee Freez son los sitios en que vende sus productos a sus arrendatarios. Pero esos sitios también son los sitios de negocio de los arrendatarios, quienes, a su vez venden esos productos a los consumidores. La coincidencia de ambos en un mismo sitio surge como consecuencia de los contratos de arrendamiento. Pero un contrato de arrendamiento no convierte en empleado al arrendatario y la compraventa de mercancía no convierte en empleado al comprador. En la medida en que hay relaciones de arrendamiento y de compraventa no puede hablarse propiamente de servicios realizados en el curso normal y sitios de negocios del presunto patrono.

El inciso (C) requiere demostrar que la "persona está usualmente ocupada en algún trabajo, profesión o negocio independientemente establecido de la misma naturaleza de aquel comprendido en el servicio prestado."

En *Avon* se enfatiza la existencia de una empresa separada, permanente y estable a la cual se dedique la persona, cuya vida no dependa de la continuidad de la relación con el presunto patrono y cuyos servicios estén disponibles a otras personas. En *Avon* se mencionan como elementos típicos de un negocio propio la inversión, el riesgo de pérdida y la presencia de plusvalía.

Cabe advertir que el inciso (C) no siempre implica un negocio propio. Incluye también "trabajos" y "profesiones" las cuales pueden llevarse a cabo sin crearse un negocio y sin inversión. De otro lado, el requisito de que el trabajo sea "de la misma naturaleza" del servicio prestado lo que supone es que el trabajo habitual de la persona comprenda el servicio prestado al patrono.

En el presente caso no está presente el ingrediente de inversión. El arrendamiento de un negocio en marcha no conlleva necesariamente una apreciable inversión por parte del

arrendatario, pero la ausencia de inversión no convierte al arrendatario en empleado del arrendador. Tampoco está presente el ingrediente de plusvalía a favor de los arrendatarios, pero los contratos de arrendamiento tampoco se caracterizan por ese ingrediente. Sin embargo, está presente el riesgo de pérdida: si el producto de las ventas no cubre gastos, compras y servicios, el arrendatario incurre en pérdidas.

■ Los arrendatarios tampoco tienen negocios absolutamente separados e independientes de los arrendadores. Dependen en gran medida de los productos que le suple el arrendador, pero esa dependencia se crea en las relaciones de compraventa a consecuencia de la naturaleza de franquicia que contiene esa relación; y no en relaciones de trabajo. En contratos de franquicia es común la dependencia del suministro de determinados productos y la supervisión por parte del otorgante para asegurarse que el producto no sea adulterado. Esa dependencia no convierte al concesionario en empleado del otorgante. Tampoco lo convierte el hecho de que la franquicia sea parte integrante de un contrato de arrendamiento.

Los seguros por desempleo y por enfermedades no ocupacionales pretenden eximir a personas que trabajan por su cuenta, sin sujeción a mando o supervisión, que realizan sus labores fuera de los lugares u operaciones normales de sus principales. Los arrendatarios en el presente caso, tienen la independencia necesaria de los elementos expresados como para considerarse exentos de esas leyes. Trabajan por su cuenta, sin sujeción a mando o supervisión; y si bien no tienen independencia absoluta, la cual nadie tiene, la dependencia existente es elemento integrante y necesario de sus relaciones de arrendatarios concesionarios.

■ En vista de lo anterior resolvemos que los empleados de los arrendatarios-concesionarios de Tastee Freez y los arrendatarios-concesionarios mismos, no son empleados de

dicha firma. Aquéllos, los empleados de los arrendatarios-concesionarios, son empleados de estos últimos.

*La sentencia recurrida será revocada.*

El Señor Juez Presidente disintió.