La Jueza Asociada Señora Pabón Charneco
emitió la opinión del Tribunal.
En este caso examinamos una controversia novel en nuestro ordenamiento jurídico: la validez de una “Cláusula de No Competencia en un Contrato de Franquicia”.
Resolvemos que los acuerdos de no competencia en un contrato de franquicia son válidos, siempre y cuando las restricciones temporales, espaciales y materiales sean ra-zonables para proteger los intereses legítimos del “franqui-ciante” y no provoquen dificultades irrazonables al fran-quiciado ni atenten contra el interés público.
I
Franquicias Martín’s BBQ, Inc. (compañía peticionaria o franquiciante) fue establecida por un grupo de familiares en 1997 bajo el nombre “Franquicias BBQ Inc”.(1) Esta franquicia tuvo sus orígenes en el restaurante fundado por el señor Martín Rosado en el municipio de Bayamón para 1962 y seguido por sus hijos al abrir varios restaurantes con el mismo nombre: Martín’s BBQ. Todos los restauran-tes de la franquicia ofrecen al consumidor pollo asado tipo rotisserie, preparado según la receta y los métodos estable-cidos por la franquicia, así como varios complementos.
El Sr. Luis García de Gracia (el recurrido o franqui-ciado) laboró en calidad de gerente en uno de los restau-rantes de la franquicia ubicado en el municipio de *982 Naranjito. Así las cosas, el 21 de enero de 2003, Franqui-cias Martín’s BBQ., Inc. y el recurrido suscribieron un “Contrato de Venta de Franquicia” (Contrato de Franqui-cia) para operar un restaurante en la Carr. Núm. 152 en el municipio de Naranjito por un periodo de cinco (5) años. En síntesis, el Contrato de Franquicia le otorgaba al recurrido la potestad de operar el restaurante durante el término de cinco (5) años, renovable por tres (3) términos adicionales de cinco (5) años, siempre y cuando, el franquiciado cum-pliera con todas las condiciones acordadas.
Por una parte, el franquiciante concedía al franquiciado el permiso para utilizar la marca “Martín’s BBQ”; se obli-gaba a proveerle al franquiciado el Manual de Operaciones, el Manual de Recetas y los adiestramientos requeridos. Asimismo, se obligaba a no operar ni otorgar el derecho de operar otro restaurante de la franquicia en el área designada en el Contrato de Franquicia: dos (2) millas lineales. Por otro lado, el franquiciado se comprometía a: (1) pagar un canon de entrada, así como una regalía sema-nal equivalente al cinco por ciento de las ventas del restau-rante; (2) utilizar la marca de la franquicia de forma auto-rizada; (3) no divulgar y proteger la información obtenida; (4) contribuir con el fondo de publicidad de la compañía peticionaria mediante un canon de publicidad, así como invertir en publicidad local, (5) y a no competir con los restaurantes del sistema. Sobre este último extremo, el Contrato de Franquicia contiene una Cláusula de No Com-petencia (Cláusula Núm. XVI) que dispone:(2)

CLÁUSULA DE NO COMPETENCIA

A. El Franquiciante proporciona al Franquiciado información confidencial y adiestramiento desarrollados para la utilización exclusiva de los restaurantes del sistema, por lo tanto, el fran-quiciado no podrá dedicarse, ya sea directa o indirectamente, por sí o a través de otras personas, sociedades, corporaciones o entidades, poseer, mantener, asesorar, participar, o tener nin- *983 gún interés en negocios o restaurantes dedicados a promover o vender productos de alimentos preparados iguales o similares a los del Sistema.
B. Esta cláusula de no competencia tendrá una vigencia de dos (2) años, a partir del momento en que se dé por terminado o venza este contrato por cualquier causa.
C. Esta cláusula de no competencia se aplicará a un radio de 10 millas de cualquier restaurante de la franquicia.
D. El Franquiciante podrá requerir a los oficiales, directores, accionistas, miembros, socios y gerentes con acceso a informa-ción y adiestramiento confidencial suscriban un acuerdo similar al contenido en esta cláusula de no competencia.
A finales de 2007, el recurrido informó a la compañía peticionaria que no renovaría el Contrato de Franquicia. No obstante, al terminar la relación contractual, el recu-rrido continúo operando un restaurante en el mismo local y, según alegó la compañía peticionaria,
... con la decoración, colores y ‘menú board’ distintivos de Martin’s BBQ. Los recibos de su caja registradora seguían diciendo ‘Martin’s BBQ’, y en cuanto al rótulo exterior, el de-mandado cambió el nombre a ‘Wachi’s BBQ’, pero el logo era casi idéntico al de Martin’s BBQ.(3)
Ante lo anterior, el 2 de abril de 2008, la compañía pe-ticionaria instó una demanda de interdicto preliminar y permanente para solicitar, inter alia, el cumplimiento de la Cláusula de No Competencia. Señaló ante el Tribunal de Primera Instancia que no solicitaba el cierre del restau-rante del recurrido ni que éste descontinuara la venta de arroces, todo tipo de carne y otros productos, sino que se le restringiera la venta de los cuatro (4) productos caracterís-ticos de la franquicia; a saber: pollo asado, yuca, amarillos y batatas.
Mediante Resolución de 30 de junio de 2008, el Tribunal de Primera Instancia razonó que, aunque el Contrato de Franquicia era amplio y prohibía la venta de productos similares, no podía impedir la venta de productos más allá *984 de aquellos que caracterizaban la franquicia. Así las cosas, concedió un interdicto preliminar restringiendo la venta de los cuatro (4) productos en el restaurante y refrendó el acuerdo de las partes para que el recurrido eliminara los colores y diseños distintivos de Martín’s BBQ.(4)
Denegada una Reconsideración presentada por el recu-rrido al tribunal de instancia, el 20 de noviembre de 2008, éste acudió ante el Tribunal de Apelaciones para alegar que la Cláusula de No Competencia era irrazonable y excesiva. El 18 de marzo de 2009, el tribunal apelativo emitió una Sentencia mediante la cual revocó el interdicto emitido por el Tribunal de Primera Instancia al determi-nar que éste coartaba el derecho a trabajar del recurrido, así como que el plazo de dos (2) años en la Cláusula de No Competencia y sin mediar contraprestación alguna estaba en contravención con la norma jurisprudencial establecida por este Tribunal en Arthur Young & Co. v. Vega III, 136 D.P.R. 157 (1994). Oportunamente, la compañía peticiona-ria presentó una solicitud de reconsideración que fue dene-gada por el tribunal apelativo.
Inconforme, la compañía peticionaria acude ante nos mediante el recurso de certiorari para señalar los errores siguientes:
Al suscribirse un contrato de franquicias, ¿se crea una relación patrono-empleado, o una de contratistas independientes?

Erró el TA al aplicar a una cláusula de no competencia de un contrato de franquicias, los criterios de un contrato de patrono-empleado.

Erró el TA al dictar una sentencia que no tiene base en las determinaciones de hechos formuladas por el TPI, sustitu-yendo las mismas por conclusiones incompatible con tales de-terminaciones de hechos. Petición de certiorari, págs. 7-8.
Examinado el recurso, concedimos al recurrido un tér- *985 mino para mostrar causa por la cual no debíamos expedir el recurso. Contando con el beneficio de la comparecencia del recurrido, procedemos a resolver.
II
A. Contratos de franquicia
Los negocios, bajo un sistema de franquicias, se originaron en Estados Unidos y representan un componente significativo de la economía estadounidense —y de la economía mundial— puesto que este método es adaptable a una gran variedad de productos y servicios. Como noción básica del concepto, la franquicia comercial constituye un sistema para expandir un negocio cuyos contratos, como hemos señalado, “se caracterizan por la concesión a empresarios independientes del privilegio de distribuir productos de determinadas marcas o de prestar servicios bajo determinados nombres”. (5) Tastee Freez v. Negdo. Seg. Empleo, 108 D.P.R. 495, 501 (1979). Tal privilegio es explotado por el franquiciado, usualmente en un área geográfica específica y exclusiva, mediante una compensación financiera que éste presta y según el método o sistema prescrito *986 por el franquiciante. Por otro lado, el franquiciante se com-promete en muchos casos a proveer ciertos conocimientos y estrategias de negocio, asistencia, supervisión en cuanto a la uniformidad entre los negocios del sistema y otros ser-vicios al franquiciado. I Glickmarís Franchising, págs. 2-2 a 2-7 (2006).
Previo a la Segunda Guerra Mundial, ya este sistema de negocio era ampliamente conocido, particularmente en el sector de la distribución de productos tales como automó-viles, productos petrolíferos y gaseosas. Posteriormente, comenzó la explotación de las franquicias comerciales y de servicios —con cadenas de heladerías y restaurantes de comida rápida— cuyo desarrollo se intensificó entre las dé-cadas de 1950 a 1970. D. Gurnick y S. Vieux, Case History of American Business Franchising, 24 Okla. City U.L. Rev. 37 (1999).
Parte de la gran aceptación que ha tenido el sistema de franquicias se debe a que es, en principio, beneficioso para ambos contratantes, así como para los consumidores, entre otros.(6) M.A. Domínguez García, El Contrato de Franquicia, en A.B. Berkovitz Rodríguez-Cano, Contratos Mercan-tiles, Navarra, Ed. Aranzadi, 2001, págs. 296-297. Por una parte, el franquiciante aumenta su capital mediante las cuotas y los pagos efectuados por el franquiciado, con-tando, además, con el ímpetu de éste. Por otro lado, el fran-quiciado se beneficia, inter alia, al poder operar un negocio con cierta independencia bajo un nombre o una marca re-conocidos, y con la asistencia y entrenamiento del franqui-ciante: permitiendo a pequeños comerciantes la oportuni-dad de tener un negocio propio. Asimismo, se ha entendido que es ventajoso para el comprador, pues fomenta la crea- *987 ción de marcas que garantizan la calidad y uniformidad de los productos vendidos o servicios provistos en unión a esta marca. Además, ayuda a disminuir el costo de búsqueda del consumidor. Esto, pues, “[l]a finalidad del contrato es, en parte, la de mantener unas normas uniformes en la operación de los establecimientos que llevan un nombre común para asegurar que el público obtiene la misma cali-dad de productos y servicios en todos los establecimientos de dicha firma”. J.A. Cuevas Segarra y A. Román García, Los contratos especiales: Puerto Rico y España, San Juan, Pubs. J.T.S., 1998, pág. 89.
No obstante, su rápido desarrollo, como respuesta a la promulgación de leyes antimonopolio y su potencial uso abusivo, llevaron a diferentes estados de Estados Unidos a regular las franquicias a comienzos de la década de 1970, particularmente respecto a la divulgación de información, registro, así como la relación entre el franquiciante y el franquiciado.
Así las cosas, en 1978 la Comisión Federal de Comercio (F.T.C., por sus siglas en inglés) promulgó el Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, 16 CFR sec. 436 et seq., según enmendado, también conocido como la “Regla F.T.C.”, mediante la cual exige al franquiciante la divulga-ción de cierta información previo a la venta de una franquicia. (7)
De un análisis legislativo podemos colegir que se ha con-siderado que una forma conveniente de proteger al fran-quiciado de los abusos vividos en el pasado —contra fran-quiciados desinformados y sin experiencia en los negocios— es a través de la transmisión de la información necesaria al franquiciado para analizar el negocio antes de *988 comprometerse.(8) Por lo que hay autores que consideran que tales exigencias han promovido el desarrollo de fran-quiciados educados y menos vulnerables en comparación a los franquiciados de la década de 1970. W.L. Killion, The Modern Myth of the Vulnerable Franchisee: The Case for a More Balanced View of the Franchisor-Franchisee Relationship, 28 (Núm. 1) Franchise L.J. 23, 29 (2008); E.A. Braun, Policy Issues of Franchising, 14 Sw.U.L. Rev. 155, 224-225 (1984); D.P. Horwitz y W.M. Volpi, Regulating the Franchise Relationship, 54 St. John’s L. Rev. 217, 245-49 (1980); P.I. Blumberg y K.A. Strasser, The Law of Corporate Groups: enterprise liability in commercial relationship, including franchising licensing, health care enterprises, successor liability, lender liability and inherent agency, Nueva York, Ed. Aspen, 1998, pág. 54.
La reglamentación federal descrita no ocupa el campo ni tampoco comprende requisito alguno respecto a la finaliza-ción ni renovación de este tipo de contrato fuera de las industrias petrolíferas y automotrices.(9) T.M. Pitegoff y *989 W.M. Garner, Franchise Relationship Laws, en R.M. Bar-koff y A.C. Selden, Fundamentals of Franchising, 3ra ed., Chicago, American Bar Association, 2008, pág. 186. Por lo que los aspectos sustantivos, así como la ejecución de las ampliamente usadas clausulas de no competir, son una cuestión primordialmente de derecho contractual estatal. P.J. Klarfeld, Introduction to the Second Edition en Covenants Against Competition in Franchise Agreements, 2da ed., Chicago, American Bar Association 2003, pág. XV. Em-pero, cabe apuntar que en este tipo de relación frecuente-mente también entran en juego el derecho de marcas y las normas antimonopolísticas, inter alia.
En Puerto Rico, los Contratos de Franquicia están desprovistos de reglamentación(10) y tampoco hemos tenido la oportunidad de estudiar este sistema de hacer negocios con detenimiento en nuestra jurisprudencia; es, pues, un contrato atípico, aunque socialmente típico. No obstante, en Tastee Freez v. Negdo. Seg. Empleo, supra, pág. 501, guiados por el principio de la libertad contractual por el que “[l]os contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público”, Art. 1207 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 3372, reconocimos la existencia de este tipo de contratación y expresamos que “[n]ada hay en nuestras leyes que prohíba esta clase de contratos”. Tastee Freez v. Negdo. Seg. Empleo, supra, pág. 501.
Empero, para un análisis íntegro también debemos te-ner presente otros principios contractuales aplicables, tales como el principio de pacta sunt servanda y el de buena *990 fe contractual, así como las reglas de hermenéutica aplica-bles a los contratos.
Tales principios cobran gran importancia en el contexto de las franquicias puesto que, como contrato atípico, “franchises are unique systems in which separate units are combined into highly integrated enterprises and held together by contract”. Blumberg y Strasser, supra, págs. 54-55.
En síntesis, concluimos que los contratos de franquicia están aceptados en nuestro ordenamiento y están regidos por nuestro derecho contractual. Asimismo, en conjunción con la doctrina prevaleciente, el derecho federal, el derecho mercantil, así como con nuestra jurisprudencia, destaca-mos que la relación existente entre ffanquiciante y ffan-quiciado es de empresarios independientes. Tastee Freez v. Negdo. Seg. Empleo, supra. Véanse, además, Domínguez García, op. cit., págs. 303-304.
B. Cláusulas de No Competencia en el Contrato de Fran-quicia
Las Cláusulas de No Competencia, aquellas incorporadas en un contrato con el propósito de restringir que una de las partes se involucre en un negocio, o una actividad, mediante el cual pueda competir con la otra, se encuentran particularmente en tres (3) tipos de contratos: empleo, venta de negocios y franquicias. B.A. Bagdon y M.M. Kellerman, When Will Courts Issue Preliminary Injunctions to Enforce Restrictive Covenants in Franchise Agreement?, 28(Núm. 3) Franchise L.J. 141 (2009).
En Puerto Rico, como regla general, los acuerdos de no competencia son válidos con base en el principio de libertad de contratación. En Arthur Young & Co. v. Vega III, supra, aceptamos la aplicabilidad de la regla de razonabilidad a las Cláusulas de No Competencia en el campo laboral. Además, aceptamos la licitud de este tipo de cláu- *991 sula, siempre y cuando, ésta fuera razonable a la luz de los criterios siguientes:
Primero, el patrono debe tener un interés legítimo en dicho acuerdo, esto es, de no recibir la protección de una cláusula de no competencia, su negocio se vería sustancialmente afectado. La magnitud de este interés se medirá, entre otras cosas, a la luz de la posición del empleado dentro de la empresa. Esto es, la existencia del interés del patrono estará directamente rela-cionada y dependerá de que el empleado, por la posición que asume en la empresa, esté facultado para competir de forma efectiva con su patrono en un futuro.
Segundo, el alcance de la prohibición debe corresponder con el interés del patrono, en cuanto a objeto, término y lugar de restricción o clientes afectados. El objeto de la prohibición se debe limitar a actividades similares a las efectuadas por el patrono; no es necesario que se limite a las funciones específi-cas del empleado. El término de no competencia no debe exce-derse de doce (12) meses, entendiéndose que cualquier tiempo adicional es excesivo e innecesario para proteger adecuada-mente al patrono. Por último, respecto al alcance de la prohi-bición, el contrato debe especificar los límites geográficos o los clientes afectados. En cuanto al área geográfica a la que aplica la restricción, ésta debe limitarse a la estrictamente necesaria para evitar la competencia real entre el patrono y el empleado. Cuando la prohibición de competencia se refiere a los clientes, debe referirse sólo a aquellos que el empleado atendió perso-nalmente durante un periodo razonable de tiempo antes de renunciar, o en un periodo inmediatamente anterior a la re-nuncia, y que al hacerlo todavía eran clientes del patrono. Es-tos elementos se evaluaran teniendo en mente la naturaleza de la industria involucrada y el posible interés público relacionado.
Tercero, el patrono debe ofrecer una contraprestación a cam-bio de la firma del acuerdo de no competir por parte del empleado. Esta contraprestación puede consistir, por ejemplo, en la obtención de un ascenso, de beneficios adicionales en el trabajo o del disfrute de cambios sustanciales de similar natu-raleza en las condiciones de empleo. Incluso sería suficiente que un candidato obtenga el empleo deseado en la empresa. Sin embargo, no se admitirá como causa del acuerdo de no competencia la mera permanencia en el empleo.
Cuarto, los pactos de no competencia, como todo contrato, deben contar con los elementos esenciales para su validez: consentimiento, objeto y causa. Art. 1213 del Código Civil, 31 L.P.R.A. sec. 3391. Sin embargo, en este tipo de contratos se- *992 remos especialmente estrictos al asegurarnos de que el em-pleado firmó libre y voluntariamente el contrato de no competencia. No permitiremos coacción o presión indebida al-guna por parte del patrono. Nada se ha alegado en el caso de marras que nos permita inferir que hubo tal coacción o presión indebida. Esta consideración, sin embargo, es innecesaria a la luz de lo que resolvemos a continuación sobre la validez del contrato.
Finalmente, es indispensable que los pactos de no compe-tencia consten por escrito. Arthur Young & Co. v. Vega III, supra, págs. 175-176.
En este caso también rechazamos la posibilidad “de mo-dificar la voluntad de las partes para ajustarla a normas razonables” por lo que determinamos que es “nulo todo pacto de no competir que no cumpla con las condiciones anteriores”.(11) Arthur Young & Co. v. Vega III, supra, pág. 177. En éste concluimos que, a pesar de que la cláusula era válida en cuanto a las funciones prohibidas, la clientela afectada y la contraprestación realizada, era excesiva en cuanto al término de la prohibición. Por consiguiente la declaramos ineficaz y nula por contravenir al orden público y a la buena fe contractual.
Asimismo, este Foro ha tenido la oportunidad de analizar los pactos de no competencia en las relaciones comerciales. En G.G. Supp. Corp. v. S.F. Systs., Inc., 153 D.P.R. 861, 874 (2001), aclaramos al juzgador el análisis que ha de seguir para este tipo de restricciones al amparo del Art. 2 de la Ley Núm. 77 de 25 de jimio de 1964, según enmendada, conocida como la Ley de Monopolios y Restricción del Comercio, 10 L.P.R.A. sec. 258. Tal disposición indica que:
*993 Todo contrato, combinación en forma de trust o en otra forma, o conspiración para restringir irrazonablemente los ne-gocios o el comercio en el Estado Libre Asociado de Puerto Rico o en cualquier sector de éste, por la presente se declaran ile-gales y toda persona que haga tales contratos o se comprometa en tales combinaciones incurrirá en delito menos grave. Íd.
Ante este precepto, expresamos que “no todo acuerdo de no competencia que complementa un negocio o un acuerdo entre competidores potenciales es de por sí y, sin más, ilegal y detrimental a la competencia”. Así, para evaluar este tipo de acuerdo adoptamos como métodos de análisis la regla per se(12) y la regla de la razonabilidad, no sin prestar las debidas advertencias respecto a ambas. Particularmente en cuanto a la regla de razonabilidad, método de análisis aplicable a los hechos del caso, señalamos que ésta
... requiere un análisis extenso y ponderado de todas las circunstancias del caso específico. Algunos elementos a consi-derar cuando se utiliza este método de análisis son, entre otros: (a) estudiar los hechos particulares del negocio al que se le está aplicando la restricción, incluyendo una definición de los productos que compiten actualmente o podrían competir en el futuro; (b) la composición y comportamiento del mercado; (c) la condición del negocio o mercado antes y después de la res-tricción; (d) la naturaleza de la restricción; (e) el efecto real o probable de la restricción.(13) G.G. Supp. Corp. v. S.F. Systs., Inc., supra, pág. 871. Véase P. Muñoz Rosario, Cláusula de No Competencia: ¿validez o restricción irrazonable? un estudio *994 comparado entre el sistema jurídico de Puerto Rico y el de Es-paña, 47 Rev. Der. Pur. 23 (2007).
No obstante, por primera vez este Tribunal estudia las Cláusulas de No Competencia, también denominadas Cláusulas de No Restablecimiento en el ámbito de los Con-tratos de Franquicia.
Los Contratos de Franquicia incluyen frecuentemente Cláusulas de No Competencia para limitar o prohibir la competencia, tanto durante la vigencia del contrato como con posterioridad a ésta. Esto, porque se ha considerado como un mecanismo de protección del sistema de franquicias, con el objetivo de evitar que quienes fueran franquiciados desarrollen negocios similares en la misma área geográfica y utilizando las mismas destrezas, la información confidencial y los contactos que adquirieron por medio del franquiciante, convirtiéndose posteriormente en la competencia del sistema.(14) T.R Pearce, L.R. King y T.C. Tharrington, The Enforcement of Post-Termination Remedies in the Franchise Contract, 24 Okla. City U.L. Rev. 81, 92 (1999). No obstante, su análisis por las legislaturas y los tribunales ha sido hmitado.(15)
Se deduce de nuestro estudio que, en general, estas Cláusulas de No Competencia son consideradas lícitas tanto por los distintos estados de Estados Unidosp(16) como *995 por los Estados miembros de la Comunidad Europea.(17) Esto, siempre y cuando los términos de la cláusula sean razonables. Sin embargo, no se puede observar un patrón o uniformidad en el trato de este tipo de cláusulas entre las distintas jurisdicciones, incluso civilistas.(18)
Puesto que las Cláusulas de No Competencia son comu-nes, tanto en los contratos de empleo como en los de venta de negocios y ante la atipicidad del Contrato de Franqui-cia, la jurisprudencia estatal en Estados Unidos se ha dividido respecto al análisis que se ha de seguir en este tipo de cláusulas en los Contratos de Franquicia. Alguna lo compara con los contratos de venta de negocio(19) y otras con las cláusulas en los contratos de empleo, en la que aplica la regla de razonabilidad de forma más estricta al entender que el patrono tiene un mayor poder de negocia-ción y en protección al derecho a trabajar del individuo.(20) Glickman, supra, pág. 3A-35. Esta divergencia ocurre por-que el Contrato de Franquicia tiene elementos de ambos. The Franchise and Dealership Termination Handbook, Chicago, ABA, 2004, pág. 220. Tal proceder ha sido criti- *996 cado por varios autores quienes reconocen que, aunque ambos contextos proveen un inicio en el análisis de este tipo de controversia, las situaciones e intereses implicados difieren sustancialmente.(21) Véanse: Klarfeld, op. cit., pág. XVI; R.W. Emerson, Franchising Covenants Against Competition, 80 Iowa L. Rev. 1049, 1051-1052 (1995).
Como mencionáramos, la relación existente en un Contrato de Franquicia entre el franquiciante y franquiciado no es de patrono-empleado, sino entre empresarios, por lo que los intereses que afectan la razonabilidad de este tipo de restricción son distintos. El franquiciado no es cabalmente comparable con un empleado a la hora de suscribir un Contrato de Franquicia que contiene una Cláusula de No Competencia. Por consiguiente, así como ex-presa Domínguez García:
La frecuencia práctica de la subordinación económica del franquiciado, como parte más débil de la relación, necesitada *997 de tutela en los aspectos de incidencia de la disparidad de poder negocial entre las partes ha de presumirse, a mi juicio, con carácter relativo en ningún caso absoluto. El estableci-miento de control legal cogente sobre la base de una noción abstracta de parte más débil ... postergando el principio de la libre determinación de las partes ... en aras de una determi-nada categoría de personas físicas o jurídicas, en este caso de naturaleza empresarial, no parece la solución más precisa del problema. Es sin duda más acorde con la estricta justicia material la remisión del mismo al control judicial casuístico. Do-mínguez García, op. cit., pág. 307.
Empero, no ignoramos la diferencias existentes entre la relación de las partes en un Contrato de Franquicia y otras relaciones comerciales. Por consiguiente, luego de analizar los beneficios y las desventajas del uso de este tipo de cláu-sulas en los Contratos de Franquicias y en consideración a los principios contractuales mencionados, aceptamos la li-citud de las Cláusulas de No Competencia en los Contratos de Franquicia, siempre y cuando éstas sean razonables.
Las restricciones en cuanto al tiempo, área geográfica y actividades deben ser razonables en lo necesario para proteger los intereses legítimos del franquiciante. De igual forma, no deben provocar dificultades irrazonables al franquiciado, ni pueden atentar contra el interés público. De lo contrario, éstas se consideraran contrarias a la buena fe contractual y al orden público.
En lo concerniente a los intereses del franquiciante, éste puede tener una diversidad de intereses que se han de proteger. Con fines ilustrativos, algunos de éstos pueden ser: el método o sistema propio de hacer negocios, la infor-mación confidencial y propietaria, los secretos de negocio, la propiedad intelectual y su relación con los clientes existentes.(22)
*998 No obstante, no basta con argumentar alguno de estos intereses, sino que debe demostrarse que el interés es lo suficientemente importante como para imponer razonable-mente una restricción al franquiciado. Los tribunales de-bemos estar atentos al interés expresado puesto que es ante el interés legítimo del franquiciante que se mide la razonabilidad de los límites impuestos al franquiciado. De igual manera, no puede perderse de mira que no sólo el franquiciante ha invertido tiempo, esfuerzo y dinero en crear un método “exitoso” de negocios, también los franqui-ciados, quienes en muchos casos han invertido todos sus recursos y han asumido el riesgo. A esos efectos, un pacto de no competencia irrazonable les puede afectar en extremo.
Además, la Cláusula de No Competencia debe ser razonable en cuanto a las restricciones temporales, territoriales y materiales. La jurisprudencia de los estados de Estados Unidos varía grandemente en cuanto al periodo de tiempo que se puede considerar razonable para la restricción de competencia.(23) Asimismo, fluctúa respecto al alcance territorial de la cláusula. Mientras algunos estados la limitan al área de exclusividad de la franquicia en cuestión, otros han permitido las restricciones fundamentadas en las ubicaciones de los negocios de otros franquiciados.
Es una práctica común el que los franquiciantes abar-quen con estas cláusulas un espacio mayor al área de ex-clusividad concedida al franquiciado bajo supuesto de pro-teger a otros franquiciados. Emerson, supra, pág. 1060. Al *999 respecto, este Tribunal rehúsa establecer parámetros espe-cíficos para estos aspectos, dado que lo que se puede consi-derar un término razonable en un caso puede que no lo sea en otro al considerar estos tres elementos con las particula-ridades del negocio y los intereses de ambas partes. Aun cuando adoptamos esta postura, en consideración a la buena fe contractual y justicia, acogemos un enfoque de reciprocidad en cuanto a los límites territoriales. Conclui-mos que, salvo en aquellos casos en los que el franquiciante pueda demostrar un interés que requiera mayor protección territorial —valorando en su conjunto la razonabilidad de las restricciones temporales, espaciales y materiales— o en aquellos casos en los que no se especifique un área exclusiva para la franquicia durante el término de la vigencia del contrato, el alcance territorial de la cláusula se debe limi-tar al espacio de operación de la franquicia en contro-versia.(24)
En cuanto a la materia, las actividades restringidas de-ben limitarse a aquellas que pongan al franquiciante en desventaja competitiva, del franquiciado continuar el uso del método o de la información propia del franquiciante, entre otros aspectos, perjudicando así los intereses legíti-mos de éste.
III
Tenemos ante nos una controversia sobre la validez de una Cláusula de No Competencia luego de terminado el Contrato de Franquicia, sobre el que no hay disputa res-pecto a la validez del consentimiento, objeto y causa.
Conforme expresáramos, el Contrato de Franquicia es un contrato atípico que se rige por la voluntad de las partes contratantes, en cuanto ésta no sea contraria a *1000 las leyes, a la moral, ni al orden público y que descansa en las relaciones de buena fe de ambas. Asimismo, las Cláu-sulas de No Competencia, en este caso en un Contrato de Franquicia, son permitidas y válidas, siempre y cuando sean razonables al valorar las restricciones temporales, es-paciales y materiales con las particularidades del negocio, los intereses de ambas partes y el interés público.
Procedemos entonces a analizar si la Cláusula de No Competencia suscrita en el Contrato de Franquicia en con-troversia es razonable o no a la luz de los planteamientos de las partes y los criterios de análisis esbozados.
El franquiciante aduce que la Cláusula de No Compe-tencia es el único remedio que posee para proteger el sis-tema de franquicias y “evitar el uso de recetas secretas, modo de preparación de alimentos y secretos que Martin’s BBQ le haya provisto al concesionario”.(25)
De otra forma, arguye, se estaría permitiendo que el recurrido “compita directamente con el concedente, en el mismo local que dio a conocer con el nombre, los productos, las recetas y los secretos del concedente”.(26) Asimismo, ex-presa que de no ponerse en vigor la Cláusula de No Com-petencia ocurrirían los daños siguientes: “a) peligro de con-fusión al público; b) amenaza al sistema mismo de la franquicia; c) mensaje equivocado a los demás concesiona-rios de que el acuerdo se puede violar; d) amenaza al mo-delo de negocio”.(27)
Consideramos que en el caso de autos, ante una franqui-cia de creación reciente, es particularmente meritoria la alegación de que a través de la Cláusula de No Competen-cia se busca proteger el sistema de franquicias, así como las recetas y formas de hacer negocio del franquiciante. A su vez, el recurrido ganó experiencia y clientela utilizando el nombre, los métodos y las recetas del franquiciante y *1001 posteriormente continuó la operación de un negocio en el mismo local y prácticamente bajo el mismo formato. Ante estas circunstancias, concluimos que el franquiciante probó un interés legítimo que merece protección.
En cuanto a las restricciones en tiempo, espacio y ma-teria, la Cláusula de No Competencia limita la competen-cia por un término de dos (2) años, en un radio de diez (10) millas de cualquier restaurante de franquicia y respecto a la promoción o venta de productos alimenticios preparados iguales o similares a los del sistema.
La compañía peticionaria arguye que jurisprudencia de estados de Estados Unidos ha validado Cláusulas de No Competencia con plazos de tiempo y distancias más largos. Asimismo, es su contención que la prueba desfilada esta-bleció los productos que se pretendían proteger: pollo asado, yuca, amarillos y batatas, y que la restricción era mínima al no prohibírsele al franquiciado continuar su ne-gocio y vender una amplia variedad de productos.(28)
El recurrido, por su parte, expresa que la compañía pe-ticionaria no ha probado la razonabilidad y necesidad de un término de dos (2) años para proteger sus intereses, siendo éste excesivo a la luz de Arthur Young & Co. V. Vega III, supra. Igualmente, argumenta que la corta extensión geográfica de Puerto Rico y la existencia de cincuenta (50) restaurantes bajo la franquicia en la isla tienen el efecto de impedirle la operación de un negocio en nuestra jurisdicción.(29) Respecto a la razonabilidad de la materia expresó que las restricciones de la Cláusula de No Compe-tencia adolecen de vaguedad y amplitud.
Concluimos que el término de dos años y la restricción de venta de productos iguales o similares a los del sistema de franquicias son razonables en el caso de autos. El Con- *1002 trato de Franquicia en controversia no impedía la explota-ción de un restaurante por el recurrido en el mismo inmue-ble y durante el periodo de dos (2) años sujeto a, inter alia, que éste cesara el uso de métodos confidenciales, procedi-mientos y técnicas asociadas con el sistema; removiera los rasgos distintivos y estructurales que lo identificaran con la franquicia y devolviera los materiales provistos sin man-tener copia alguna. (30) Por lo tanto, las restricciones provis-tas en tiempo y materia protegían el interés legítimo del franquiciante y no presentaban dificultades irrazonables para el franquiciado.
No obstante, al examinar la prohibición espacial de la Cláusula de No Competencia, a la luz del principio de re-ciprocidad y en conjunción a las restricciones temporales y materiales analizadas, determinamos que ésta fue exce-siva en el contexto específico y particular de los hechos de este caso. Esto, porque mientras el área de operación de la franquicia del recurrido era de apenas dos (2) millas linea-les, la Cláusula de No Competencia limitaba al franqui-ciado a no competir en una extensión de diez (10) millas de cualquier restaurante de la franquicia. Tampoco la compa-ñía peticionaria presentó razones de peso por las que re-quiriera un alcance territorial mayor. Además, considera-ciones de interés público y las restricciones geográficas de Puerto Rico, nos llevan a esta conclusión.
Por consiguiente, ante el rechazo de este Tribunal de modificar la voluntad de las partes, según ha sido expre-sada en una Cláusula de No Competencia que no cumpla con todas las condiciones de razonabilidad, concluimos que la Cláusula de No Competencia en el Contrato de Franqui-cia de autos no es razonable y, por ende, no es válida. Por lo tanto, ésta es contraria a la buena fe contractual y al orden público.
Por lo expuesto, expedimos el auto solicitado y, por fun-damentos distintos, confirmamos la sentencia recurrida. *1003 Empero, puntualizamos que nuestro dictamen se limita a la validez de la Cláusula de No Competencia y no modifica el acuerdo transaccional mediante el cual el recurrido acordó eliminar los colores que se identifican con Martin’s BBQ, cubrir la parte superior del rótulo del negocio y de-volver el menu board perteneciente a la compañía peticionaria.

Se dictará sentencia de conformidad.

 La franquicia fue establecida en 1997 con el nombre “Franquicias BBQ Inc.”. El 15 de julio de 2004 se inscribió la franquicia “Martín’s BBQ, Inc.”, a la que se le transfirieron todos los derechos y las acciones de Franquicias BBQ Inc.

 Apéndice V de la Petición de certiorari, págs. 63-64.

 Petición de certiorari, pág. 5.

 Mediante una transacción judicial el recurrido acordó eliminar los colores que se identifican con Martín’s BBQ; cubrir la parte superior del rótulo del negocio y devolver el menu board perteneciente a la compañía peticionaria. Asimismo, el tribunal de instancia ordenó a la compañía peticionaria la prestación de dos mil dólares ($2,000) en concepto de fianza.

 No es hasta décadas recientes que el término “franquicia” se aplica a los contratos privados. D. Gurnick y S.Vieux, Case History of American Business Franchising, 24 Okla. City U.L. Rev. 37, 37-39 (1999).
Cabe señalar que “[e]n la actualidad no existe un concepto de contrato de fran-quicia que sea válido para cualquier ordenamiento o unánimemente aceptado”. J.I. Ruiz Peris, El contrato de franquicia y las nuevas normas de defensa de la compe-tencia, Madrid, Ed. Civitas, 1991, pág. 16. Las distintas jurisdicciones han confron-tado ciertas dificultades en definir el concepto, por lo que las definiciones adoptadas varían entre estados y leyes, según el propósito regulatorio buscado. P.I. Blumberg y K.A. Strasser, The Law of Corporate Groups enterprise liability in commercial relationship, including franchising licensing, health care enterprises, successor liability, lender liability and inherent agency, Nueva York, Ed. Aspen, 1998, págs. 55-56; I Glickman’s Franchising, págs. 2-6 (2006). Por ejemplo, autores civilistas han tratado de enmarcar el Contrato de Franquicia en el de la concesión y licencia de marca y posteriormente como un contrato autónomo. Véase Ruiz Peris, op. cit., págs. 19-20. En todo caso, el Tribunal Supremo de España ha reconocido que el contrato de fran-quicia es “un contrato atípico, en este caso mercantil”. Sentencia del Tribunal Supremo de España de 27 de septiembre de 1996. Véanse: J.R. Cano Rico, Manual Práctico de Contratación Mercantil, Madrid, Ed. Tecnos, 2002, T. I, pág. 764; M.A. Domínguez García, El Contrato de Franquicia, en A.B. Berkovitz Rodríguez-Cano, Contratos Mercantiles, Navarra, Ed. Aranzadi, 2001, pág. 298.

 Véase, W.L. Killion, The Modern Myth of the Vulnerable Franchisee: The Case for a More Balanced View of the Franchisor-Franchisee Relationship, 28 (Núm. 1) Franchise L.J. 23, 29 (2008) (“[D]ata tells ... that the continued health of franchising is important to the franchisor, franchisee, potential business owner, supplier, franchise employee, investor, individual consumer, and the economy as a whole”).

 Además, el derecho federal provee una reglamentación para las franquicias en industrias específicas, tales como el petróleo y los automóviles. Véanse: Automobile Dealer’s Franchise Act, 15 U.S.C.A. sec. 1221 et seq.; Petroleum Marketing Practices Act, 15 U.S.C.A. sec. 2801 et seq.

 La Comisión Federal de Comercio ha estudiado la posibilidad de regular otros aspectos de los Contratos de Franquicia que apliquen a toda industria, inclu-yendo el uso de cláusulas de no competir postcontractuales. No obstante, ha prefe-rido limitarlo caso por caso. Véase Statement of Basis and Purpose, Disclosure Requirements and Prohibitions Concerning Franchising, 72 Fed. Reg. 15,447 (30 de marzo de 2007). (“[T]he Commission cannot categorically conclude that prospective franchisees who voluntarily enter into franchise agreements, after receiving full disclosure, nontheless cannot reasonably avoid harm resulting from a franchisor enforcing the terms of its franchise agreement.”) http://www.ftc.gov/os/2007/01/ R511003FranchiseRuleFRNotice.pdf
De igual forma, otras jurisdicciones modelan sus regulaciones de los Contratos de Franquicia, siguiendo la experiencia y desarrollo en Estados Unidos. Véanse: R.W. Emerson, Franchise Contracts and Territoriality: A French Comparison, 3 Entrepren. Bus. L.J. 315, 339 (2009) (La ley francesa, Ley Núm. 89-1008 de 31 de diciembre de 1989, según enmendada, protege a los franquiciantes a través del su-ministro de información previo a la formación del contrato de franquicia.); B. Schwartz y L. Zylberman, Franchise Symposium Materials: International Franchise Regulation, 8 Asper Rev. Int’l Bus. & Trade L. 317 (2008); Domínguez García, op. cit., pág. 310. Véase sobre el ordenamiento jurídico español, Real Decreto 201/20Í0, de 26 de febrero, por el que se regula el ejercicio de la actividad comercial en régimen de franquicia y la comunicación de datos al registro de franquiciadores, Boletín Oficial del Estado Núm. 63 de 13 de marzo de 2010, págs. 25037-46.

 “The FTC does not intend to preempt the franchise practices laws of any state or local government, except to the extent of any inconsistency with part 436. A law is not inconsistent with part 436 if it affords prospective franchisees equal or *989 greater protection, such as registration of disclosure documents or more extensive disclosures.” Disclosure Requirements and Prohibitions Concerning Franchising, 16 C.F.R. sec. 436.10(b).

 La Ley Núm. 75 de 24 de junio de 1964, según enmendada, 10 L.P.R.A. sec. 278 et seq., se limita a regular la terminación o no renovación de un contrato de distribución sin justa causa, y aplica a aquellas personas que caen bajo la imprecisa definición de distribuidor.

 Respecto al Contrato de Franquicia, nos persuade, además, la observación siguiente: “Courts that refuse to reform an unreasonable covenant recognize such a covenant’s in terrorem potential. The refusal to rectify is based on a policy of preventing franchisor aggrandizement. If courts held otherwise, franchisors could fashion overbroad covenants with the confidence that most franchisees would respect their contractual obligations — no matter how burdensome — and that, if one or two franchisees ever violated the covenants, the judiciary still would modify and then enforce these covenants.” R.W. Emerson, Franchising Covenants Against Competition, 80 Iowa L. Rev. 1049, 1057 (1995).

 “La Regla per se condena la restricción comercial impugnada sin examinar su propósito o hacer un extenso análisis de su efecto en el mercado y el daño a la competencia. ... Para efectos procesales de la regla per se, la parte que alegadamente violó la ley antimonopolística debe derrotar la presunción de irrazonabilidad e ilegalidad”. G.G. Supp. Corp. v. S.F. Systs., Inc., 153 D.P.R. 861, 870-871 (2001). En G.G. Supp. Corp. v. S.F. Systs., Inc., supra, págs. 873 y 876, señalamos que en aten-ción a la delicada economía de Puerto Rico, como regla general, no se debe resolver un caso sobre una restricción comercial mediante el Art. 2 de la Ley Núm. 77 de 25 de junio de 1964, según enmendada, 10 L.P.R.A. see. 258 eí seq., según el procedi-miento de la regla per se.

 El impacto de un acuerdo de competencia se mide al amparo de la Ley Núm. 77, supra, y en referencia a la competencia y no al competidor. G.G. Supp. Corp. v. S.F. Systs., Inc., supra.

 La efectividad de las Cláusulas de No Competir para proteger un sistema de franquicias ha sido puesta en duda por diversos autores, quienes proponen diversas alternativas. R.E. Johnson y R.G. Greenstein, Achieving “Victory Through Prearran-gements”: Supplementing Covenants Not to Compete, 22 Franchise L.J. 21 (2002); Emerson, Franchising Covenants Against Competition, supra, págs. 1098-1099.

 Algunos estados han adoptado leyes con relación a las Cláusulas de No Competencia en los Contratos de Franquicia, por ejemplo: Dakota del Norte, Indiana, Louisiana y Minnesota. Véase RJ. Klarfeld, Covenants Against Competition in Franchise Agreements, 2da ed., Chicago, American Bar Association, 2003.

 Otros estados prohíben las Cláusulas de No Competencia en general, pero que al no exceptuar aquellas contenidas en los Contratos de Franquicia, esta prohi-bición les puede ser aplicable. Íd. Véase, además, Glickman, Franchising, op. cit, pág. 9-63.

 El Reglamento (CE) Núm. 2790/1999 de la Comisión de 22 de diciembre de 1999, relativo a la aplicación del apartado 3 del Art. 81 del Tratado CE a determi-nadas categorías de acuerdos verticales y prácticas concertadas, aplica directamente a los acuerdos de franquicia que afectan al mercado comunitario.

 Asimismo, “many nations essentially take the same approach found in American antitrust law and common law, while some severely restrict franchise covenants against post-termination competition or even prohibit them outright”. Emerson, Franchising Covenants Against Competition, supra, págs. 1096-1097.

 H & R Block Tax Services v. Circle A. Enter., 693 N.W.2d 548 (2005); Boulanger v. Dunkin’ Donuts, Inc., 815 N.E. 2d 572 (2004); Jiffy Lube Intern., Inc. v. Weiss Bros., Inc., 834 F. Supp. 683 (N.J. 1993).

 En general, las Cláusulas de No Competencia en el ámbito laboral han recibido un análisis más vigoroso que aquéllas en los contratos de venta de negocio por los intereses particulares implicados. Véase M.A. Gauthier, The SJC and Dun-kin’Donuts: Squeezing the Filling out of the Small Franchisee, 41 (Núm. 4) New Eng. L. Rev. 757 (2007) (argumenta que los convenios de no competir en los Contratos de Franquicia deben ser examinados al amparo del modelo patrono-empleado al consi-derar “large multi-million dollar corporation versus small, local, inexperienced, first-time business owners”. Tales supuestos difieren significativamente de los hechos del caso de autos). Véanse, además: Piercing Pagoda, Inc. v. Hoffner, 351 A.2d 207 (1976); Gandolfo’s Deli Boys, LLC v. Holman, 490 F. Supp.2d 1353 (Ga. 2007); Carvel Corp. v. Eisenberg, 692 F. Supp. 182 (N.Y. 1988).

 “Some key differences are:
“1. The franchise agreement contemplates the association of the franchisee with the franchised system’s goodwill, while such an association tends to be, at most, an incidental effect of the employment relationship.
“2. Essential trademarks or service marks, as well as the use of trade secrets, are much more likely to be entrusted to franchisees than to employees.
“3. Unlike most employees, franchisees may lose their substantial capital investments upon termination.
“4. The competitive activities that an ex-franchisee undertakes often directly affect the economic interests of present franchisees; an exemployee’s former coworkers usually have fewer such concerns arising from the ex-employee’s post-termination competition.
“5. Franchises involve long-term contracts in which the franchisor retains considerable control over the franchisee’s operations. However, the ordinary sale of a business presents a “clean break,” with the seller departing the scene and the buyer taking over the business completely.
“6. Unlike sellers of a business, franchisees typically are not compensated for the value of their business when the franchise relationship is terminated.” (Escolios omitidos.) Emerson, supra, págs. 1052-1053.
Véase, además, Budget Rent-A-Car Corporation of America v. Fein, 342 F.2d 509, 516 (5to Cir. 1965) (“Although both parties as well as the Trial Judge have attempted to put this case in one category or the other, realistically, [the restrictive covenant] does not fit in either, and we decline to believe that Georgia would decide this case by simply slipping it into one or the other. However, it is proper to look to both kinds of cases for the presence or absence in this fact situation of the kind of factors which have been held to tip the balance one way or the other”).

 Hay estudios que revelan que, aun cuando se anuncie que un restaurante franquiciado, es propiedad y operado por un tercero, poco más de un tercio de la clientela entenderá que no es operado por el franquiciante. R.W. Emerson, Franchisors’Liabüity When Franchisees Are Apparent Agents: An Empirical and Policy Analysis of “Common Knowledge’’ About Franchising, 20 Hofstra L. Rev. 609, 656 *998 (1992). “[Rlegardless of whether customers understand that ownership and operations are now totally separate from the former franchisor, the former franchisor’s concern remains — how to prevent franchisee misappropriation of trade secrets and other confidential information.” Emerson, supra, pág. 1072 esc. 105.

 Las restricciones temporales admitidas por las cortes varían, teniendo un alcance de entre seis meses a tres años. Emerson, supra, pág. 1054; Glickman, supra, pág. 3A-37. El Art. 5(b) del Reglamento (CE) Núm. 2790/1999 de la Comisión, supra, limita las Cláusulas de No Competencias a un año luego de la expiración del contrato.

 Emerson, supra, pág. 1088. Además, la extensión territorial limitada de la isla nos hace pensar que de esta forma se llega a unos efectos más razonables.

 Petición de certiorari, pág. 11.

 Íd, pág. 17.

 Íd, pág. 20.

 Del Contrato de Franquicia surge que el franquiciado no está restringido de continuar operando un negocio, pero sí que debe evitar entre otras cosas sugerir conexión con el franquiciante por distintos medios. Apéndice V de la Petición de certiorari, págs. 66-67.

 Alegato en Cumplimiento de Orden, pág. 14.

 Apéndice V de la Petición de certiorari, pág. 66.