

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Franquicias Martín's BBQ, Inc.<br><br>    Peticionario<br><br>              v.<br><br>Luis García de Gracia<br><br>    Recurrido | Certiorari<br><br>2010 TSPR 71<br><br>178 DPR ____ |

Número del Caso: CC-2009-410

Fecha: 10 de mayo de 2010

Tribunal de Apelaciones:

        Región Judicial de Bayamón, Panel V

Jueza Ponente:      Hon. Nydia M. Cotto Vives

Abogados de la Parte Peticionaria:

                Lcdo. Hugo Rodríguez Díaz
                Lcdo. Arnaldo I. Fernandini Sánchez
                Lcda. Yalees Llavona Delgado

Abogado de la Parte Recurrida:

                Lcda. César H. Soto Cintrón

Materia: Interdicto Preliminar y Permanente

Este documento constituye un documento oficial del    Tribunal Supremo que está sujeto a los cambios y correcciones del pr    oceso de compilación y publicación oficial de las decisiones    del Tribunal. Su distribución electrónica se hace como un servicio p    úblico a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Franquicias Martín´s BBQ, Inc.

        Peticionario

        v.

Luis García De Gracia           CC-2009-0410

        Recurrido

*Certiorari*

Opinión del Tribunal emitida por la Jueza Asociada señora Pabón Charneco

San Juan, Puerto Rico, a 10 de mayo de 2010.

En el día de hoy examinamos una controversia novel en nuestro ordenamiento jurídico, la validez de una Cláusula de No Competencia en un Contrato de Franquicia.

Resolvemos que los acuerdos de no competencia en un Contrato de Franquicia son válidos, siempre y cuando, las restricciones temporales, espaciales y materiales sean razonables para proteger los intereses legítimos del franquiciante y éstas no provoquen dificultades irrazonables al franquiciado, ni atenten contra el interés público.

I

Franquicias Martín's BBQ, Inc., en adelante, compañía peticionaria o franquiciante, fue

establecida por un grupo de familiares en el 1997 bajo el nombre "Franquicias BBQ Inc".[1] Esta franquicia tuvo sus orígenes en el restaurante fundado por el Sr. Martín Rosado en el Municipio de Bayamón para el año 1962 y que fuera modelado por sus hijos al abrir varios restaurantes con el mismo nombre: Martín's BBQ. Todos los restaurantes de la franquicia ofrecen al consumidor pollo asado tipo *rotisserie* preparado según la receta y métodos establecidos por la franquicia, así como varios complementos.

El Sr. Luis García de Gracia, en adelante, el recurrido o franquiciado, laboró en calidad de Gerente en uno de los restaurantes de la franquicia ubicado en el Municipio de Naranjito. Así las cosas, el 21 de enero de 2003, Franquicias Martín´s BBQ. Inc. y el recurrido suscribieron un Contrato de Venta de Franquicia, en adelante, Contrato de Franquicia, para operar un restaurante en la Carr. Núm. 152 en el Municipio de Naranjito por un periodo de cinco (5) años. En extrema síntesis, el Contrato de Franquicia le otorgaba al recurrido la potestad de operar el mencionado restaurante durante el término de cinco (5) años, renovable por tres (3) términos adicionales de cinco (5) años, siempre y cuando, el franquiciado cumpliera con todas las condiciones acordadas.

---

[1] La franquicia fue establecida en el 1997 bajo el nombre "Franquicias BBQ Inc." El 15 de julio de 2004 se inscribió la franquicia "Martín´s BBQ, Inc." a la que se le transfirieron todos los derechos y acciones de Franquicias BBQ Inc.

Por una parte, el franquiciante concedía al franquiciado permiso para utilizar la marca "Martín´s BBQ"; se obligaba a proveerle al franquiciado el *Manual de Operaciones*, el *Manual de Recetas* y los adiestramientos requeridos. Asimismo, se obligaba a no operar ni otorgar el derecho de operar otro restaurante de la franquicia dentro del área designada en el Contrato de Franquicia: dos (2) millas lineales. Por otro lado, el franquiciado se comprometía a pagar un canon de entrada, así como una regalía semanal equivalente al cinco por ciento (5%) de las ventas del restaurante; utilizar la marca de la franquicia de forma autorizada; no divulgar y proteger la información obtenida; contribuir con el Fondo de Publicidad de la compañía peticionaria mediante un canon de publicidad, así como invertir en publicidad local, y a no competir con los restaurantes del sistema. Sobre este último extremo, el Contrato de Franquicia contiene una Cláusula de No Competencia (Cláusula Núm. XVI) que dispone[2]:

### CLÁUSULA DE NO COMPETENCIA

A. El Franquiciante proporciona al Franquiciado información confidencial y adiestramiento desarrollados para la utilización exclusiva de los restaurantes del sistema, por lo tanto, el franquiciado no podrá dedicarse, ya sea directa o indirectamente, por sí o a través de otras personas, sociedades, corporaciones o entidades, poseer, mantener, asesorar, participar, o tener ningún interés en negocios o restaurantes dedicados a promover

---

[2] Apéndice V de la Petición de *Certiorari*, págs. 63-64.

o vender productos de alimentos preparados iguales o similares a los del Sistema.

B. Esta cláusula de no competencia tendrá una vigencia de dos (2) años, a partir del momento en que se dé por terminado o venza este contrato por cualquier causa.

C. Esta cláusula de no competencia se aplicará a un radio de 10 millas de cualquier restaurante de la franquicia.

D. El Franquiciante podrá requerir a los oficiales, directores, accionistas, miembros, socios y gerentes con acceso a información y adiestramiento confidencial suscriban un acuerdo similar al contenido en esta cláusula de no competencia.

A finales del año 2007, el recurrido informó a la compañía peticionaria que no renovaría el Contrato de Franquicia. No obstante, al terminar la relación contractual, el recurrido continúo operando un restaurante en el mismo local y, según alegó la compañía peticionaria:

…con la decoración, colores y 'menú board' distintivos de Martín´s BBQ. Los recibos de su caja registradora seguían diciendo 'Martín´s BBQ', y en cuanto al rótulo exterior, el demandado cambió el nombre a 'Wachi´s BBQ', pero el logo era casi idéntico al de Martín´s BBQ.[3]

Ante lo anterior, el 2 de abril de 2008, la compañía peticionaria instó una Demanda de interdicto preliminar y permanente solicitando, *inter alia*, el cumplimiento de la Cláusula de No Competencia. Señaló ante el Tribunal de Primera Instancia que no solicitaba el cierre del restaurante del recurrido, ni que éste descontinuara la

---

[3] *Petición de Certiorari,* pág. 5.

venta de arroces, todo tipo de carne y otros productos, sino que se le restringiera la venta de los **cuatro (4) productos característicos de la franquicia**, a saber, pollo asado, yuca, amarillos y batatas.

Mediante Resolución del 30 de junio de 2008, el Tribunal de Primera Instancia razonó que aunque el Contrato de Franquicia era amplio y prohibía la venta de productos similares, no podía impedir la venta de productos más allá de aquellos que caracterizaban la franquicia. Así las cosas, concedió un interdicto preliminar restringiendo la venta de los cuatro (4) productos en el restaurante y refrendó el acuerdo de las partes para que el recurrido eliminara los colores y diseños distintivos de Martín´s BBQ.[4]

Denegada una Reconsideración presentada por el recurrido al tribunal de instancia, el 20 de noviembre de 2008 éste acudió ante el Tribunal de Apelaciones alegando que la Cláusula de No Competencia era irrazonable y excesiva. El 18 de marzo de 2009, el tribunal apelativo emitió Sentencia mediante la cual revocó el interdicto emitido por el Tribunal de Primera Instancia al determinar que éste coartaba el derecho a trabajar del recurrido, así como que el plazo de dos (2) años en la Cláusula de No Competencia y sin mediar contraprestación alguna estaba en

---

[4] Mediante transacción judicial el recurrido acordó eliminar los colores que se identifican con Martín´s BBQ; cubrir la parte superior del rótulo del negocio y devolver el *menu board* perteneciente a la compañía peticionaria. Asimismo, el tribunal de instancia ordenó a la compañía peticionaria la prestación de dos mil dólares ($2,000) en concepto de fianza.

contravención con la norma jurisprudencial establecida por este Tribunal en *Arthur Young & Co. v. Vega III*, 136 D.P.R. 157 (1994). Oportunamente, la compañía peticionaria presentó una Solicitud de Reconsideración que fue denegada por el tribunal apelativo.

Inconforme, la compañía peticionaria acude ante nos mediante el recurso de *certiorari* señalando los siguientes errores:

> **Al suscribirse un contrato de franquicias, ¿se crea una relación patrono-empleado, o una de contratistas independientes?**
>
> **Erró el TA al aplicar a una cláusula de no competencia de un contrato de franquicias, los criterios de un contrato de patrono-empleado.**
>
> **Erró el TA al dictar una sentencia que no tiene base en las determinaciones de hechos formuladas por el TPI, sustituyendo las mismas por conclusiones incompatible con tales determinaciones de hechos.**

Examinado el recurso, concedimos al recurrido un término para mostrar causa por la cual no debíamos expedir el recurso. Contando con el beneficio de la comparecencia del recurrido, procedemos a resolver.

## II

A. Contratos de Franquicia

Los negocios bajo un sistema de franquicias se originaron en Estados Unidos y representan un componente significativo de la economía estadounidense –y de la economía mundial– puesto que este método de hacer negocios es adaptable a una gran variedad de productos y servicios. Como noción básica del concepto, la franquicia comercial

constituye un sistema para expandir un negocio cuyos contratos, como hemos señalado, "se caracterizan por la concesión a empresarios independientes del privilegio de distribuir productos de determinadas marcas o de prestar servicios bajo determinados nombres".[5] *Tastee Freez v. Negdo. Seg. Empleo*, 108 D.P.R. 495, 501 (1979). Tal privilegio es explotado por el franquiciado, usualmente dentro de un área geográfica específica y exclusiva, en virtud de una compensación financiera que éste presta y según el método o sistema prescrito por el franquiciante. Por otro lado, el franquiciante se compromete en muchos casos a proveer ciertos conocimientos y estrategias de negocio, asistencia, supervisión en cuanto a la uniformidad entre los negocios del sistema y otros servicios al franquiciado. G. Glickman, *Franchising*, Nueva York, Ed. M. Bender, 2006, Vol. I, págs. 2-2, 2-7.

---

[5] No es hasta décadas recientes que el término "franquicia" se aplica a los contratos privados. D. Gurnik y S. View, *Case History of American Business Franchising*, 24 Okla. City U.L. Rev. 37, 37-39(1999).

Cabe señalar que "[e]n la actualidad no existe un concepto de contrato de franquicia que sea válido para cualquier ordenamiento o unánimemente aceptado". J.I. Ruiz Peris, *El Contrato de Franquicia y las Nuevas Normas de Defensa de la Competencia*, Madrid, Ed. Civitas, 1991, pág. 16. Las distintas jurisdicciones han confrontado ciertas dificultades en definir el concepto, por lo que las definiciones adoptadas varían entre estados y leyes según el propósito regulatorio buscado. P.I. Blumberg y K.A. Strasser, *The Law of Corporate Groups*, Nueva York, Ed. Aspen, 1998, págs. 55-56; G. Glickman, *Franchising*, Nueva York, Ed. M. Bender, 2006, Vol. I págs. 2-6. Por ejemplo, autores civilistas han tratado de enmarcar el Contrato de Franquicia en el de concesión y licencia de marca y posteriormente como un contrato autónomo. Véase, Ruiz Peris, *op. cit.*, págs. 19-20. En todo caso, el Tribunal Supremo de España ha reconocido que el contrato de franquicia es "un contrato atípico, en este caso mercantil…" Sentencia del Tribunal Supremo de España del 27 de septiembre de 1996. Véanse, J.R. Cano Rico, *Manual Práctico de Contratación Mercantil*, Madrid, Ed. Tecnos, 2002, T. I, pág. 764; M.A. Domínguez García, *El Contrato de Franquicia, en* A.B. Berkovitz Rodríguez-Cano, *Contratos Mercantiles*, Navarra, Ed. Aranzadi, 2001, pág. 298.

Previo a la Segunda Guerra Mundial ya este sistema de negocio era ampliamente conocido, particularmente en el sector de distribución de productos tales como automóviles, productos petrolíferos y gaseosas. Posteriormente, comenzó la explotación de las franquicias comerciales y de servicios –con cadenas de heladerías y restaurantes de comida rápida– cuyo desarrollo se intensificó entre las décadas de 1950 a 1970. D. Gurnik y S. View, *Case History of American Business Franchising*, 24 Okla. City U.L. Rev. 37(1999).

Parte de la gran aceptación que ha tenido el sistema de franquicias se debe a que es, en principio, beneficioso para ambos contratantes, así como para los consumidores, entre otros.[6] M.A. Domínguez García, *El Contrato de Franquicia, en* A.B. Berkovitz Rodríguez-Cano, *Contratos Mercantiles*, Navarra, Ed. Aranzadi, 2001, págs. 296-97. Por una parte, el franquiciante aumenta su capital mediante las cuotas y pagos efectuados por el franquiciado, contando, además, con el ímpetu de éste. Por otro lado, el franquiciado se beneficia, *inter alia*, al poder operar un negocio con cierta independencia bajo un nombre o marca reconocido y con la asistencia y entrenamiento del franquiciante; permitiendo a pequeños comerciantes la oportunidad de tener un negocio propio. Asimismo, se ha

---

[6] Véase, W.L. Killion, *The Modern Myth of the Vulnerable Franchisee*, 28(Núm. 1) Franchise L. J. 23, 29 (Verano 2008)("[D]ata tells […] that the continued health of franchising is important to the franchisor, franchisee, potential business owner, supplier, franchise employee, investor, individual consumer, and the economy as a whole.")

entendido que es ventajoso para el comprador pues fomenta la creación de marcas que garantizan la calidad y uniformidad de los productos vendidos o servicios provistos en unión a dicha marca. Además, ayuda a disminuir el costo de búsqueda del consumidor. Esto, pues, "[l]a finalidad del contrato es, en parte, la de mantener unas normas uniformes en la operación de los establecimientos que llevan un nombre común para asegurar que el público obtiene la misma calidad de productos y servicios en todos los establecimientos de dicha firma". J.A. Cuevas Segarra y A. Román García, *Los Contratos Especiales*, Publicaciones J.T.S., 1998, pág. 89.

No obstante, su rápido desarrollo, como respuesta a la promulgación de leyes antimonopolio y su potencial uso abusivo, llevaron a diferentes estados de los Estados Unidos a regular las franquicias a comienzos de la década de 1970, particularmente respecto a la divulgación de información, registro, así como la relación entre el franquiciante y el franquiciado.

Así las cosas, en el 1978 la Comisión Federal de Comercio (F.T.C., por sus siglas en inglés) promulgó el *Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures,* 16 CFR secs. 436 *et seq.*, según enmendado, también conocido como la "Regla F.T.C.", mediante la cual exige al franquiciante la

divulgación de cierta información previo a la venta de una franquicia.[7]

De un análisis legislativo podemos colegir que se ha considerado que una forma conveniente de proteger al franquiciado de los abusos vividos en el pasado –contra franquiciados desinformados y sin experiencia en los negocios– es a través de la transmisión de la información necesaria al franquiciado para analizar el negocio antes de comprometerse.[8] Por lo que hay autores que consideran que tales exigencias han promovido el desarrollo de franquiciados educados y menos vulnerables en comparación a los franquiciados de la década de 1970. W.L. Killion, *The Modern Myth of the Vulnerable Franchisee*, 28(Núm. 1)

---

[7] Además, el derecho federal provee reglamentación para las franquicias en industrias específicas, tales como el petróleo y automóviles. Véanse, *Automobile Dealer´s Franchise Act*, 15 U.S.C. sec. 1221 *et seq.*; *Petroleum Marketing Practices Act*, 15 U.S.C. sec. 2801 *et seq.*

[8] La Comisión Federal de Comercio ha estudiado la posibilidad de regular otros aspectos de los Contratos de Franquicia que apliquen a toda industria, incluyendo el uso de cláusulas de no competir post contractuales. No obstante, ha preferido limitarlo caso por caso. Véase, Statement of Basis and Purpose, *Disclosure Requirements and Prohibitions Concerning Franchising,* 72 Fed. Reg. 15,447 (30 de marzo de 2007). ("[T]he Commission cannot categorically conclude that prospective franchisees who voluntarily enter into franchise agreements, after receiving full disclosure, nontheless cannot reasonably avoid harm resulting from a franchisor enforcing the terms of its franchise agreement.")

De igual forma, otras jurisdicciones modelan sus regulaciones de los Contratos de Franquicia siguiendo la experiencia y desarrollo en Estados Unidos. Véanse, R.W. Emerson, *Franchise Contracts and Territoriality: A French Comparison*, 3 Entrepren. Bus. L.J. 315, 339 (2009) (La ley francesa, Ley Núm. 89-1008 de 31 de diciembre de 1989, según enmendada, protege a los franquiciantes a través del suministro de información previo a la formación del contrato de franquicia.); B. Schwartz y L. Zylberman, *Franchise Symposium Materials: International Franchise Regulation,* 8 Asper Rev. Int'l Bus. & Trade L. 317 (2008); M.A. Domínguez García, *supra*, pág. 310. Véase sobre el ordenamiento jurídico español, *Real Decreto 201/2010, de 26 de febrero, por el que se regula el ejercicio de la actividad comercial en régimen de franquicia y la comunicación de datos al registro de franquiciadores*, Boletín Oficial del Estado Núm. 63 de 13 de marzo de 2010, págs. 25037-46.

Franchise L. J. 23, 29(Verano 2008); E.A. Braun, *Policy Issues of Franchising, 14 Sw.U.L. Rev. 155, 224-25 (1984);* D.P. Horwitz y W.M. Volpi, *Regulating the Franchise Relationship*, 54 St. John's L. Rev. 217, 245-49 (1980). *Contra*, P.I. Blumberg y K.A. Strasser, *The Law of Corporate Groups*, Nueva York, Ed. Aspen, 1998, pág. 54.

La reglamentación federal antes descrita no ocupa el campo y tampoco comprende requisito alguno respecto a la finalización ni renovación de este tipo de contrato fuera de las industrias petrolíferas y automotrices.[9] T.M. Pitegoff y W.M. Garner, *Franchise Relationship Laws,* en R.M. Barkoff y A.C. Selden, *Fundamentals of Franchising,* Chicago, American Bar Association (3ra ed. 2008) pág. 186. Por lo que los aspectos sustantivos, así como la ejecución de las ampliamente usadas clausulas de no competir, son una cuestión primordialmente de derecho contractual estatal. P.J. Klarfeld, *Introduction to the Second Edition* en *Covenants Against Competition in Franchise Agreements*, Chicago, American Bar Association (2da ed. 2003) pág. XV. Empero, cabe apuntar que en este tipo de relación frecuentemente también entran en juego el derecho de marcas y las normas antimonopolísticas, *inter alia*.

---

[9] "The FTC does not intend to preempt the franchise practices laws of any state or local government, except to the extent of any inconsistency with part 436. A law is not inconsistent with part 436 if it affords prospective franchisees equal or greater protection, such as registration of disclosure documents or more extensive disclosures." *Disclosure Requirements and Prohibitions Concerning Franchising*, 16 C.F.R. sec. 436.10(b).

En Puerto Rico los Contratos de Franquicia están desprovistos de reglamentación[10] y tampoco hemos tenido la oportunidad de estudiar este sistema de hacer negocios con detenimiento en nuestra jurisprudencia; siendo pues, un contrato atípico, aunque socialmente típico. No obstante, en *Tastee Freez v. Negdo. Seg. Empleo*, *supra,* pág. 501, guiados por el principio de la libertad contractual por el que "[l]os contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público", Artículo 1207 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3372, reconocimos la existencia de este tipo de contratación y expresamos que "[n]ada hay en nuestras leyes que prohíba esta clase de contratos".

Empero, para un análisis íntegro también debemos tener presente otros principios contractuales aplicables tales como el principio de *pacta sunt servanda* y el de buena fe contractual, así como las reglas de hermenéutica aplicables a los contratos.

Tales principios cobran gran importancia en el contexto de las franquicias puesto que, como contrato atípico "franchises are unique systems in which separate units are combined into highly integrated enterprises and

---

[10] La Ley Núm. 75 de 24 de junio de 1964, según enmendada, 10 L.P.R.A. sec. 278 *et seq*., se limita a regular la terminación o no renovación de un contrato de distribución sin justa causa, y es aplicable a aquellas personas que caen bajo la imprecisa definición de distribuidor.

held together by contract". P.I. Blumberg y K.A. Strasser, *supra*, págs. 54-55.

En síntesis, concluimos que los contratos de franquicia están aceptados en nuestro ordenamiento y están regidos por nuestro derecho contractual. Asimismo, en conjunción con la doctrina prevaleciente, el derecho federal, el derecho mercantil, así como con nuestra jurisprudencia, destacamos que la relación existente entre franquiciante y franquiciado es una de empresarios independientes. *Tastee Freez v. Negdo. Seg. Empleo*, *supra*. Véanse, además, M.A. Domínguez García, *supra*, págs. 303-04.

B. Cláusulas de No Competencia en el Contrato de Franquicia

Las Cláusulas de No Competencia, aquellas cláusulas incorporadas en un contrato con el propósito de restringir el que una de las partes se involucre en un negocio o actividad mediante el cual pueda competir con la otra, se encuentran particularmente en tres (3) tipos de contratos: empleo, venta de negocios y franquicias. B.A. Bagdon y M.M. Kellerman, *When Will Courts Issue Preliminary Injunctions to Enforce Restrictive Covenants in Franchise Agreement?*, 28(Núm.3) Franchise L. J. 141 (Invierno 2009).

En Puerto Rico, como regla general, los acuerdos de no competencia son válidos con base en el principio de libertad de contratación. En *Arthur Young & Co. v. Vega III*, *supra,* aceptamos la aplicabilidad de la regla de

razonabilidad a las Cláusulas de No Competencia en el campo

laboral. Además, aceptamos la licitud de este tipo de

cláusula, siempre y cuando, ésta fuera razonable a la luz

de los siguientes criterios:

Primero, el patrono debe tener un interés legítimo en dicho acuerdo, esto es, de no recibir la protección de una cláusula de no competencia, su negocio se vería sustancialmente afectado. La magnitud de este interés se medirá, entre otras cosas, a la luz de la posición del empleado dentro de la empresa. Esto es, la existencia del interés del patrono estará directamente relacionada y dependerá de que el empleado, por la posición que asume en la empresa, esté facultado para competir de forma efectiva con su patrono en un futuro.

Segundo, el alcance de la prohibición debe corresponder con el interés del patrono, en cuanto a objeto, término y lugar de restricción o clientes afectados. El objeto de la prohibición se debe limitar a actividades similares a las efectuadas por el patrono; no es necesario que se limite a las funciones específicas del empleado. El término de no competencia no debe exceder de doce meses, entendiéndose que cualquier tiempo adicional es excesivo e innecesario para proteger adecuadamente al patrono.

Por último, respecto al alcance de la prohibición, el contrato debe especificar los límites geográficos o los clientes afectados. En cuanto al área geográfica a la que aplica la restricción, ésta debe limitarse a la estrictamente necesaria para evitar la competencia real entre el patrono y el empleado. Cuando la prohibición de competencia se refiere a los clientes, debe referirse sólo a aquellos que el empleado atendió personalmente durante un periodo razonable de tiempo antes de renunciar, y que al hacerlo, o en un periodo inmediatamente anterior a la renuncia, todavía eran clientes del patrono. Estos elementos se evaluaran teniendo en mente la naturaleza de la industria involucrada y el posible interés público relacionado.

Tercero, el patrono debe ofrecer una contraprestación a cambio de la firma del acuerdo de no competir por parte del empleado. Esta contraprestación puede consistir, por ejemplo, en

la obtención de un ascenso, de beneficios
adicionales en el trabajo o del disfrute de
cambios sustanciales de similar naturaleza en las
condiciones de empleo. Incluso seria
contraprestación suficiente que un candidato
obtenga el empleo deseado en la empresa. Sin
embargo, no se admitirá como causa del acuerdo de
no competencia la mera permanencia en el empleo.

Cuarto, los pactos de no competencia, como todo
contrato, deben contar con los elementos
esenciales para su validez: consentimiento,
objeto y causa. Artículo 1213 del Código Civil,
31 LPRA sec. 3391. Sin embargo, en este tipo de
contratos seremos especialmente estrictos al
asegurarnos de que el empleado firmó libre y
voluntariamente el contrato de no competencia. No
permitiremos coacción o presión indebida alguna
por parte del patrono. Nada se ha alegado en el
presente caso que nos permita inferir que hubo
tal coacción o presión indebida. Esta
consideración, sin embargo, es innecesaria a la
luz de lo que resolvemos a continuación sobre la
validez del contrato.

Finalmente, es indispensable que los pactos de no
competencia consten por escrito. *Arthur Young &
Co. v. Vega III*, *supra,* págs. 175-76.

En el referido caso también rechazamos la posibilidad
"de modificar la voluntad de las partes para ajustarla a
normas razonables" por lo que determinamos que es "nulo
todo pacto de no competir que no cumpla con las condiciones
anteriores". [11] *Arthur Young & Co. v. Vega III*, pág. 177.
En éste concluimos que a pesar de que la cláusula era
válida  en cuanto a las funciones prohibidas, la clientela

---

[11] Respecto al Contrato de Franquicia, nos persuade, además, la siguiente observación: "Courts that refuse to reform an unreasonable covenant recognize such a covenant's in terrorem potential. The refusal to rectify is based on a policy of preventing franchisor aggrandizement. If courts held otherwise, franchisors could fashion overbroad covenants with the confidence that most franchisees would respect their contractual obligations--no matter how burdensome--and that, if one or two franchisees ever violated the covenants, the judiciary still would modify and then enforce these covenants". R.W. Emerson, *Franchising Covenants Against Competition*, 80 Iowa L. Rev. 1049, 1057 (1995).

afectada y la contraprestación realizada, era excesiva en cuanto al término de la prohibición. Por consiguiente declaramos la misma ineficaz y nula por contravenir el orden público y la buena fe contractual.

Asimismo, este Foro ha tenido la oportunidad de analizar los pactos de no competencia en las relaciones comerciales. En *G.G. & Supp. Corp. v. S. & F. Systs., Inc.*, 153 D.P.R. 861, 874 (2001), aclaramos al juzgador el análisis a seguir para este tipo de restricciones a tenor con el Artículo 2 de la Ley Núm. 77 de 25 de junio de 1964, según enmendada, conocida como Ley de Monopolios y Restricción del Comercio, 10 L.P.R.A. sec. 258. Tal disposición indica que:

> Todo contrato, combinación en forma de *trust* o en otra forma, o conspiración para restringir irrazonablemente los negocios o el comercio en el Estado Libre Asociado de Puerto Rico o en cualquier sector de éste, por la presente se declaran ilegales y toda persona que haga tales contratos o se comprometa en tales combinaciones incurrirá en delito menos grave. *Íd.*

Ante este precepto, expresamos que "no todo acuerdo de no competencia que complementa un negocio o un acuerdo entre competidores potenciales es de por sí y, sin más, ilegal y detrimental a la competencia". Así, para evaluar este tipo de acuerdo adoptamos como métodos de análisis la regla *per se*[12] y la regla de la razonabilidad, no sin

---

[12] "La Regla per se condena la restricción comercial impugnada sin examinar su propósito o hacer un extenso análisis de su efecto en el mercado y el daño a la competencia. […] Para efectos procesales de la regla per se, la parte que alegadamente violó la ley antimonopolística debe derrotar la presunción de irrazonabilidad e ilegalidad". *G.G. & Supp. Corp. v. S. & F. Systs., Inc.*, 153 D.P.R. 861, 870-71 (2001). En

prestar las debidas advertencias respecto a ambas. Particularmente en cuanto a la regla de razonabilidad, método de análisis aplicable a los hechos del caso, señalamos que ésta:

> …requiere un análisis extenso y ponderado de todas las circunstancias del caso específico. Algunos elementos a considerar cuando se utiliza este método de análisis son, entre otros: (a) estudiar los hechos particulares del negocio al que se le está aplicando la restricción, incluyendo una definición de los productos que compiten actualmente o podrían competir en el futuro; (b) la composición y comportamiento del mercado; (c) la condición del negocio o mercado antes y después de la restricción; (d) la naturaleza de la restricción; (e) el efecto real o probable de la restricción.[13] *G.G. & Supp. Corp. v. S. & F. Systs., Inc.*, *supra*, pág. 871. Véase, P. Muñoz Rosario, *Cláusula de No Competencia: ¿Validez o Restricción Irrazonable? Un Estudio Comparado entre el Sistema Jurídico de Puerto Rico y el de España*, 47 Rev. D.P. 23 (2007).

No obstante, por primera vez este Tribunal estudia las Cláusulas de No Competencia, también denominadas Cláusulas de No Restablecimiento en el ámbito de los Contratos de Franquicia.

Los Contratos de Franquicia frecuentemente incluyen Cláusulas de No Competencia para limitar o prohibir la competencia, tanto durante la vigencia del contrato como con posterioridad a ésta. Esto, porque se ha considerado

---

*G.G. & Supp. Corp. v. S. & F. Systs., Inc.*, *supra*, págs. 873, 876, señalamos que en atención a la delicada economía de Puerto Rico, como regla general, no se debe resolver un caso sobre una restricción comercial a tenor con el Artículo 2 de la Ley Núm. 77 de 25 de junio de 1964, según enmendada, 10 L.P.R.A. sec. 258 *et seq.*, bajo el procedimiento de la regla per se.

[13] El impacto de un acuerdo de competencia se mide al amparo de la Ley Núm. 77, *supra*, y en referencia a la competencia y no al competidor. *G.G. & Supp. Corp. v. S. & F. Systs., Inc.*, *supra*.

como un mecanismo de protección del sistema de franquicias con el objetivo de evitar que quienes fueran franquiciados desarrollen negocios similares dentro de la misma área geográfica y utilizando las mismas destrezas, la información confidencial y los contactos que adquirieron por medio del franquiciante, convirtiéndose posteriormente en la competencia del sistema.[14] T.P. Pearce y otros, *The Enforcement of Post-Termination Remedies in the Franchise contract,* 24 Okla. City U.L. Rev. 81, 92 (1999). No obstante, su análisis por las legislaturas y los tribunales ha sido limitado.[15]

Se desprende de nuestro estudio que, en general, estas Cláusulas de No Competencia son consideradas lícitas tanto por los distintos estados de Estados Unidos[16] como por los Estados miembros de la Comunidad Europea.[17] Esto, siempre y

---

[14] La efectividad de las Cláusulas de No Competir para proteger un sistema de franquicias ha sido puesta en duda por diversos autores, quienes proponen diversas alternativas. R.E. Johnson y R.G. Greenstein, *Achieving "Victory Through Prearrangements": Supplementing Covenants Not to Compete,* 22 Franchise L.J. 21 (Verano 2002); R.W. Emerson, *Franchising Covenants Against Competition, supra*, págs. 1098–99.

[15] Algunos estados han adoptado leyes con relación a las Cláusulas de No Competencia en los Contratos de Franquicia. Por ejemplo, Dakota del Norte, Indiana, Louisiana y Minnesota. Véase, P.J. Klarfeld, *Covenants Against Competition in Franchise Agreements*, Chicago, American Bar Association (2da ed. 2003).

[16] Otros estados prohíben las Cláusulas de No Competencia en general, pero que al no exceptuar aquellas contenidas en los Contratos de Franquicia, dicha prohibición les puede ser aplicable. *Íd.* Véase además, G. Glickman, *Franchising*, Nueva York, Ed. M. Bender, 2006, Vol. I, pág. 9-63.

[17] El Reglamento (CE) Núm. 2790/1999 de la Comisión de 22 de diciembre de 1999, relativo a la aplicación del apartado 3 del artículo 81 del Tratado CE a determinadas categorías de acuerdos verticales y prácticas concertadas, es de aplicación directa a los acuerdos de franquicia que afectan al mercado comunitario.

cuando, los términos de la cláusula sean razonables. Sin embargo, no se puede observar un patrón o uniformidad en el trato de este tipo de cláusulas entre las distintas jurisdicciones, incluso civilistas.[18]

Puesto que las Cláusulas de No Competencia son comunes tanto en los contratos de empleo como en los de venta de negocios y ante la atipicidad del Contrato de Franquicia, la jurisprudencia estatal en Estados Unidos se ha dividido respecto al análisis a seguir en este tipo de cláusulas en los Contratos de Franquicia. Alguna lo compara con los contratos de venta de negocio[19] y otras con las cláusulas en los contratos de empleo – en la que aplica la regla de razonabilidad de forma más estricta al entender que el patrono tiene mayor poder de negociación y en protección al derecho a trabajar del individuo.[20] G. Glickman, *supra*, pág. 3A-35. Esta divergencia ocurre porque el Contrato de

---

[18] Asimismo, "many nations essentially take the same approach found in American antitrust law and common law, while some severely restrict franchise covenants against post-termination competition or even prohibit them outright". R.W. Emerson, *Franchising Covenants Against Competition, supra,* págs. 1096-97.

[19] *H&R Block Tax Services, Inc. v. Circle A. Enterprises, Inc.*, 693 N.W.2d 548 (2005); *Boulanger v. Dunkin´Donuts, Inc.*, 815 N.E. 2d 572 (2004); *Jiffy Lube Int´l, Inc. v. Weiss Bros.*, 834 F. Supp. 683 (1993).

[20] En general, las Cláusulas de No Competencia en el ámbito laboral han recibido un análisis más vigoroso que aquéllas en los contratos de venta de negocio por los intereses particulares implicados. Véase, M.A. Gauthier, *The SJC and Dunkin´Donuts: Squeezing the Filling out of the Small Franchisee*, 41 New Eng. L. Rev. 757 (2007) (Argumenta que los convenios de no competir en los Contratos de Franquicia deben ser examinados bajo el modelo patrono-empleado al considerar "large multi-million dollar corporation versus small, local, inexperienced, first-time business owners". Tales supuestos difieren significativamente de los hechos del caso de autos. ) Véanse además, *Piercing Pagoda, Inc. v. Hoffner*, 351 A.2d 207 (1976); *Gandolfo´s Deli Boys, LLC v. Holfman*, 490 F. Supp. 2d 1353 (2007); *Carvel Corp. v. Eisenberg*, 692 F. Supp. 182 (1988).

Franquicia tiene elementos de ambos. American Bar Association, *The Franchise and Dealership Termination Handbook*, Chicago, 2004, pág. 220. Tal proceder ha sido criticado por varios autores quienes reconocen que, aunque ambos contextos proveen un inicio en el análisis de este tipo de controversia, las situaciones e intereses implicados difieren sustancialmente.[21] Véanse, Klarfeld, *op. cit.*, pág. XVI; R.W. Emerson, *Franchising Covenants Against Competition*, 80 Iowa L. Rev. 1049, 1051-52 (1995).

Como antes mencionáramos, la relación existente en un Contrato de Franquicia entre el franquiciante y

---

[21] "Some key differences are:

    1. The franchise agreement contemplates the association of the franchisee with the franchised system's goodwill, while such an association tends to be, at most, an incidental effect of the employment relationship.
    2. Essential trademarks or service marks, as well as the use of trade secrets, are much more likely to be entrusted to franchisees than to employees.
    3. Unlike most employees, franchisees may lose their substantial capital investments upon termination.
    4. The competitive activities that an ex-franchisee undertakes often directly affect the economic interests of present franchisees; an exemployee's former coworkers usually have fewer such concerns arising from the ex-employee's post-termination competition.
    5. Franchises involve long-term contracts in which the franchisor retains considerable control over the franchisee's operations. However, the ordinary sale of a business presents a "clean break," with the seller departing the scene and the buyer taking over the business completely.
    6. Unlike sellers of a business, franchisees typically are not compensated for the value of their business when the franchise relationship is terminated." R.W. Emerson, *Franchising Covenants Against Competition,* supra, págs. 1052-53 (1995).

Véase además, *Budget Rent-A-Car Corp. of Am. v. Fein*, 342 F.2d 509 (1965) ("Although both parties as well as the Trial Judge have attempted to put this case in one category or the other, realistically, [the restrictive covenant] does not fit in either, and we decline to believe that Georgia would decide this case by simply slipping it into one or the other. However, it is proper to look to both kinds of cases for the presence or absence in this fact situation of the kind of factors which have been held to tip the balance one way or the other.")

franquiciado no es una de patrono-empleado, sino una entre empresarios por lo que los intereses que afectan la razonabilidad de este tipo de restricción son distintos. El franquiciado no es cabalmente comparable con un empleado a la hora de suscribir un Contrato de Franquicia que contiene una Cláusula de No Competencia. Por consiguiente, así como expresa Domínguez García:

> La frecuencia práctica de la subordinación económica del franquiciado, como parte más débil de la relación, necesitada de tutela en los aspectos de incidencia de la disparidad de poder negocial entre las partes ha de presumirse, a mi juicio, con carácter relativo en ningún caso absoluto. El establecimiento de control legal cogente sobre la base de una noción abstracta de parte más débil [...] postergando el principio de la libre determinación de las partes [...] en aras de una determinada categoría de personas físicas o jurídicas, en este caso de naturaleza empresarial, no parece la solución más precisa del problema. Es sin duda más acorde con la estricta justicia material la remisión del mismo al control judicial casuístico." Domínguez García, *op. cit.*, pág. 307.

Empero, no ignoramos la diferencias existentes entre la relación de las partes en un Contrato de Franquicia y otras relaciones comerciales. Por consiguiente, luego de analizar los beneficios y desventajas del uso de este tipo de cláusulas en los Contratos de Franquicias y en consideración a los principios contractuales antes mencionados, aceptamos la licitud de las Cláusulas de No Competencia en los Contratos de Franquicia, siempre y cuando, éstas sean razonables.

**Las restricciones en cuanto al tiempo, área geográfica y actividades deben ser razonables en lo necesario para**

**proteger los intereses legítimos del franquiciante. De igual forma, no deben provocar dificultades irrazonables al franquiciado, ni pueden atentar contra el interés público.** De lo contrario, éstas se consideraran contrarias a la buena fe contractual y al orden público.

En lo concerniente a los intereses del franquiciante, éste puede tener una diversidad de intereses a proteger. Con fines ilustrativos, algunos de éstos pueden ser: el método o sistema propio de hacer negocios, la información confidencial y propietaria, los secretos de negocio, la propiedad intelectual, y su relación con los clientes existentes.[22]

No obstante, no basta argumentar alguno de estos intereses, sino que debe demostrarse que el interés es lo suficientemente importante como para imponer razonablemente una restricción al franquiciado. Los tribunales debemos estar atentos al interés expresado puesto que es ante el interés legítimo del franquiciante que se mide la razonabilidad de los límites impuestos al franquiciado. De igual manera, no puede perderse de mira que no sólo el franquiciante ha invertido tiempo, esfuerzo y dinero en

---

[22] Hay estudios que revelan que aún cuando se anuncie que un restaurante franquiciado, es propiedad y operado por un tercero, poco más de un tercio de la clientela entenderá que no es operado por el franquiciante. R.W. Emerson, *Franchisors´Liability When Franchisees Are Apparent Agents: An Empirical and Policy Analysis of "Common Knowledge" About Franchising,* 20 Hofstra L. Rev. 609, 656 (1992) "[R]egardless of whether customers understand that ownership and operations are now totally separate from the former franchisor, the former franchisor´s concern remains – how to prevent franchisee misappropriation of trade secrets and other confidential information"). R.W. Emerson, *Franchising Covenants Against Competition, supra,* esc. 105.

crear un método "exitoso" de negocios, también los franquiciados, quienes en muchos casos han invertido todos sus recursos y han asumido el riesgo. A esos efectos, un pacto de no competencia irrazonable les puede afectar en extremo.

Además, la Cláusula de No Competencia debe ser razonable en cuanto a las restricciones temporales, territoriales y materiales. La jurisprudencia de los estados de Estados Unidos varía grandemente en cuanto al periodo de tiempo que se puede considerar razonable para la restricción de competencia.[23]  Asimismo, fluctúa respecto al alcance territorial de la cláusula. Mientras algunos estados la limitan al área de exclusividad de la franquicia en cuestión, otros han permitido las restricciones basadas en las ubicaciones de los negocios de otros franquiciados.

Es una práctica común el que los franquiciantes abarquen con estas cláusulas un espacio mayor al área de exclusividad concedida al franquiciado bajo supuesto de proteger a otros franquiciados. R.W. Emerson, *supra*, pág. 1060. **Al respecto, este Tribunal rehúsa establecer parámetros específicos para estos aspectos dado que lo que se puede considerar un término razonable en un caso puede que no lo sea en otro al considerar estos tres (3)**

---

[23] Las restricciones temporales admitidas por las cortes varían, teniendo un alcance de entre seis (6) meses a tres (3) años. R.W. Emerson, *Franchising Covenants Against Competition, supra*, pág. 1054; G. Glickman, *supra,* pág. 3A-37. El Artículo 5(b) del Reglamento (CE) Núm. 2790/1999 de la Comisión, *supra*, limita las Cláusulas de No Competencias a un año luego de la expiración del contrato.

**elementos con las particularidades del negocio y los intereses de ambas partes.** Aún cuando adoptamos esta postura, en consideración a la buena fe contractual y justicia, acogemos un enfoque de reciprocidad en cuanto a los límites territoriales. **Concluimos que, salvo en aquellos casos en los que el franquiciante pueda demostrar un interés que requiera mayor protección territorial – valorando en su conjunto la razonabilidad de las restricciones temporales, espaciales y materiales – o en aquellos casos en los que no se especifique un área exclusiva para la franquicia durante el término de la vigencia del contrato, el alcance territorial de la cláusula se debe limitar al espacio de operación de la franquicia en controversia.**[24]

En cuanto a la materia, las actividades restringidas deben limitarse a aquéllas que pongan al franquiciante en desventaja competitiva, del franquiciado continuar el uso del método o información propia del franquiciante, entre otros aspectos, perjudicando así los intereses legítimos de éste.

### III

Tenemos ante nos una controversia sobre la validez de una Cláusula de No Competencia luego de terminado el Contrato de Franquicia; sobre el que no hay disputa respecto a la validez del consentimiento, objeto y causa.

---

[24] R.W. Emerson, *Franchising Covenants Against Competition, supra*, pág. 1088. Además, la extensión territorial limitada de la Isla nos hace pensar que de esta forma se llega a unos efectos más razonables.

Conforme expresáramos anteriormente, el Contrato de Franquicia es un contrato atípico que se rige por la voluntad de las partes contratantes, en cuanto ésta no sea contraria a las leyes, a la moral, ni al orden público, y que descansa en las relaciones de buena fe de ambas. Asimismo, las Cláusulas de No Competencia, en este caso en un Contrato de Franquicia, son permitidas y válidas, siempre y cuando, sean razonables al valorar las restricciones temporales, espaciales y materiales con las particularidades del negocio, los intereses de ambas partes y el interés público.

Procedemos entonces a analizar si la Cláusula de No Competencia suscrita en el Contrato de Franquicia en controversia es razonable o no a la luz de los planteamientos de las partes y los criterios de análisis antes esbozados.

El franquiciante aduce que la Cláusula de No Competencia es el único remedio que posee para proteger el sistema de franquicias y "evitar el uso de recetas secretas, modo de preparación de alimentos y secretos que Martín´s BBQ le haya provisto al concesionario".[25]

De otra forma, arguye, se estaría permitiendo que el recurrido "compita directamente con el concedente, en el mismo local que dio a conocer con el nombre, los productos, las recetas y los secretos del concedente".[26] Asimismo,

---

[25] *Petición de Certiorari,* pág. 11.

[26] *Íd.*, pág. 17.

expresa que de no ponerse en vigor la Cláusula de No Competencia ocurrirían los siguientes daños: "a) peligro de confusión al público; b) amenaza al sistema mismo de la franquicia; c) mensaje equivocado a los demás concesionarios de que el acuerdo se puede violar; d) amenaza al modelo de negocio".[27]

Consideramos que en el caso de autos, ante una franquicia de reciente creación, es particularmente meritoria la alegación de que a través de la Cláusula de No Competencia se busca proteger el sistema de franquicias, así como las recetas y formas de hacer negocio del franquiciante. A su vez, el recurrido ganó experiencia y clientela utilizando el nombre, métodos y recetas del franquiciante y posteriormente continuó la operación de un negocio en el mismo local y prácticamente bajo el mismo formato. Ante estas circunstancias, concluimos que el franquiciante probó un interés legítimo que merece protección.

En cuanto a las restricciones en tiempo, espacio y materia, la Cláusula de No Competencia limita la competencia por un término de dos (2) años, en un radio de diez (10) millas de cualquier restaurante de franquicia y respecto a la promoción o venta de productos alimenticios preparados iguales o similares a los del sistema.

_____

[27] *Íd.,* pág. 20.

La compañía peticionaria arguye que jurisprudencia de estados de Estados Unidos ha validado Cláusulas de No Competencia con plazos de tiempo y distancias más largos. Asimismo, es su contención que la prueba desfilada estableció los productos que se pretendían proteger: pollo asado, yuca, amarillos y batatas; y que la restricción era mínima al no prohibírsele al franquiciado continuar su negocio y vender una amplia variedad de productos.[28]

El recurrido, por su parte, expresa que la compañía peticionaria no ha probado la razonabilidad y necesidad de un término de dos (2) años para proteger sus intereses, siendo éste excesivo a la luz de *Arthur Young & Co. V. Vega III*, *supra*. Igualmente, argumenta que la corta extensión geográfica de Puerto Rico y la existencia de cincuenta (50) restaurantes bajo la franquicia en la Isla tienen el efecto de impedirle la operación de un negocio en nuestra jurisdicción.[29] Respecto a la razonabilidad de la materia expresó que las restricciones de la Cláusula de No Competencia adolecen de vaguedad y amplitud.

Concluimos que el término de dos (2) años y la restricción de venta de productos iguales o similares a los del sistema de franquicias son razonables en el caso de autos. El Contrato de Franquicia en controversia no impedía la explotación de un restaurante por el recurrido

---

[28] Del Contrato de Franquicia surge que el franquiciado no está restringido de continuar operando un negocio, pero sí que debe evitar entre otras cosas sugerir conexión con el franquiciante por distintos medios. Apéndice V de la Petición de *Certiorari*, págs. 66-67.

[29] *Alegato en Cumplimiento de Orden*, pág. 14.

en el mismo inmueble y durante el periodo de dos (2) años sujeto a, *inter alia*, que éste cesara el uso de métodos confidenciales, procedimientos y técnicas asociadas con el sistema; removiera los rasgos distintivos y estructurales que lo identificaran con la franquicia y devolviera los materiales provistos sin mantener copia alguna.[30] Por lo tanto, las restricciones provistas en tiempo y materia protegían el interés legítimo del franquiciante y no presentaban dificultades irrazonables para el franquiciado.

No obstante, al examinar la prohibición espacial de la Cláusula de No Competencia, a la luz del principio de reciprocidad y en conjunción a la restricciones temporales y materiales antes analizadas, determinamos que la misma fue excesiva en el contexto específico y particular de los hechos de este caso. Esto porque mientras el área de operación de la franquicia del recurrido era de apenas dos (2) millas lineales, la Cláusula de No Competencia limitaba al franquiciado a no competir en una extensión de diez (10) millas de cualquier restaurante de la franquicia. Tampoco la compañía peticionaria presentó razones de peso por las que requiriera un alcance territorial mayor. Además, consideraciones de interés público y las restricciones geográficas de Puerto Rico, nos llevan a la misma conclusión.

Por consiguiente, ante el rechazo de este Tribunal de modificar la voluntad de las partes según ha sido expresada

---

[30] Apéndice V de la Petición de *certiorari*, pág. 66.

en una Cláusula de No Competencia que no cumpla con todas las condiciones de razonabilidad, concluimos que la Cláusula de No Competencia en el Contrato de Franquicia de autos no es razonable y, por ende, no es válida. Por lo tanto, ésta es contraria a la buena fe contractual y al orden público.

Por lo antes expuesto, expedimos el auto solicitado, y, por fundamentos distintos, confirmamos la Sentencia recurrida. Empero, puntualizamos que nuestro dictamen se limita a la validez de la Cláusula de No Competencia y no modifica el acuerdo transaccional mediante el cual el recurrido acordó eliminar los colores que se identifican con Martín´s BBQ; cubrir la parte superior del rótulo del negocio y devolver el *menu board* perteneciente a la compañía peticionaria.

Se dictará Sentencia de conformidad.

Mildred G. Pabón Charneco
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Franquicias Martín´s BBQ, Inc.

    Peticionario

        v.

                            CC-2009-0410         *Certiorari*

Luis García De Gracia

    Recurrido

SENTENCIA

San Juan, Puerto Rico a 10 de mayo de 2010.

    Por lo antes expuesto, expedimos el auto solicitado, y, por fundamentos distintos, confirmamos la Sentencia recurrida. Empero, puntualizamos que nuestro dictamen se limita a la validez de la Cláusula de No Competencia y no modifica el acuerdo transaccional mediante el cual el recurrido acordó eliminar los colores que se identifican con Martín´s BBQ; cubrir la parte superior del rótulo del negocio y devolver el *menu board* perteneciente a la compañía peticionaria.

    Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo.

                      Aida Ileana Oquendo Graulau
                    Secretaria del Tribunal Supremo